# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2684

CAROLINE M. SITAR,

*Plaintiff-Appellant,*

v.

INDIANA DEPARTMENT OF TRANSPORTATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99 C 1679—**John Daniel Tinder**, *Judge.*

———————

ARGUED FEBRUARY 14, 2003—DECIDED SEPTEMBER 29, 2003

———————

Before FLAUM, *Chief Judge*, and DIANE P. WOOD and
EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Caroline Sitar's employ-
ment with the Indiana Department of Transportation
(INDOT) was short-lived. Sitar was one of the few women
to work for INDOT in its historically male Westfield Unit,
but she was transferred and terminated before the end of
six months. INDOT claims that the reason for the brevity
of Sitar's tenure was unsatisfactory performance; Sitar be-
lieves that it was the result of sex discrimination, sexual
harassment, and retaliation. The district court granted
summary judgment in favor of INDOT on all counts. We
affirm in part and reverse in part.

**I**

On October 14, 1997, INDOT hired Sitar as a "Highway Maintenance Worker III." According to the job description, Sitar's duties were to include the following tasks:

> Individual will perform road maintenance work requiring use of small tools. Also will mow grass, trim hedges, fill washes, plant shrubs and trees, drive a truck, and operate stump cutter. Will also plow snow during inclement weather and haul road maintenance materials. Perform other duties as may be required or requested.

The first six months of Sitar's employment were probationary. She was assigned to INDOT's Westfield Unit in the Tipton Sub-District, and her direct supervisor was James (Sonny) Pedigo.

Pedigo knew that the Westfield Unit historically had been an all-male work environment, where off-color jokes and lewd stories about women were not uncommon. Pedigo forewarned Sitar that some men "might not be comfortable with a female working" at the Unit. He also instructed the crew to tone it down and watch what they were saying around Sitar.

As anticipated, problems soon arose. Sitar was new and unfamiliar with workplace procedures. Whenever she made a mistake, her co-workers reported it to Pedigo, who began recording the incidents in a journal. For example, on November 14, Joe Wilson reported to Pedigo that Sitar misused the hand throttle on a snow plow, even after a warning. Sitar, however, claims that no one told her that she was creating a safety hazard. Pedigo reprimanded Sitar, who became argumentative (according to Pedigo). Pedigo told Sitar she would receive a written warning. The next day, Sitar explained to Pedigo that she suffered from medical conditions that might be affecting her behavior, including depression. She promised Pedigo she would no longer

misuse the hand throttle. Pedigo accepted this as an explanation and decided not to give Sitar a written warning.

On November 21, Sitar accused her co-worker, David Whitworth, of repeatedly paging her with the number 666. Whitworth denied the accusations, Sitar called him a lying S.O.B., and Whitworth shoved Sitar backwards. Crew leaders stepped in, and the incident was reported to Pedigo, who asked the two to apologize. After Whitworth left the room, Sitar began to cry and said to Pedigo that she was "always on pins and needles" and felt that the others "didn't really want to give [her] a chance to do [her] job," that she was "always in f------ trouble" and "they didn't want [her] working there." Both Sitar and Whitworth received formal reprimands: Sitar for verbal abuse and Whitworth for assault.

On December 11, the crew came across a dead dog with a collar on the road. The crew leader, David Carson, directed the crew to bury the dog. Sitar tried to contact Pedigo, and when she was unable to reach him, she insisted that the crew take the carcass back to the Westfield Unit so that she could attempt to contact the owners. Carson complained to Pedigo that Sitar's conduct was in violation of INDOT policy and interfered with the crew's work. Pedigo reprimanded Sitar with a verbal warning. According to Sitar, however, no one told her what the procedures entailed. Furthermore, Pedigo admitted in his deposition that in the past, crew members had brought back animal carcasses to the Westfield Unit, and so Sitar may have had reason to be confused about the policy.

On the evening of December 11, several crew members spoke with Pedigo and Ron Buell, Operations Foreman for the Tipton Sub-District, about the problems they were having with Sitar. Buell brought the situation to the attention

of Raymond Baker, manager of the Tipton Sub-District. Baker, like Sitar, was also new to the job and was on probationary status.

The next morning, Baker met with Pedigo and Buell. At that meeting, Pedigo gave Baker his journal. According to Baker, Pedigo and Buell wanted Sitar terminated immediately. According to Pedigo, however, he recommended that Sitar be transferred to the road crew at the Tipton Unit, to see whether the problem was Sitar or the men at the Westfield Unit. In his deposition, Pedigo admitted that Sitar was a good employee, and that he was not sure whether she was the cause of the crew's problems. Whitworth (who was the co-worker reprimanded for shoving Sitar during the paging incident) was also deposed and admitted that Sitar was a good worker who performed her duties satisfactorily.

Baker spoke with his supervisor, Brad Davis, who advised Baker to do whatever he thought was best. On the afternoon of December 12, Baker met with Sitar to discuss her performance issues (according to Sitar, without giving her a chance to address the allegations). Baker asked Sitar if she wanted to keep her job and told her to show up the next Monday morning at the Tipton office. Baker decided that Sitar would be transferred to the Tipton office in lieu of termination "to see if she was salvageable as an employee." Sitar was to work in the same office as Baker, so that he could keep an eye on her. Although her job title was not formally changed, her responsibilities were drastically reduced to involve primarily clerical and janitorial work, such as cleaning the telephones, refrigerator, and office area; answering the telephones; sorting the mail; and washing the vehicles of her supervisors. Pedigo admitted that she was no longer doing the job of a highway maintenance worker.

On December 17, Sitar filed a complaint of sex discrimination and hostile work environment against Baker and Whitworth with INDOT's Affirmative Action office. Baker received notice of the complaint on January 5, 1998. Lynette Price was assigned to investigate the complaint; she interviewed Baker, Whitworth, and several other co-workers. Originally, Price concluded that Baker's conduct violated Title VII, and suggested disciplinary action:

> [Baker] created a hostile working environment for Caroline. He did not discipline in any way, shape or form any of his employees when the problem had been brought to his attention about the situations that were going on with Caroline.

Price also found that the work environment at the Westfield Unit ranged from "hatefulness" to one in which Sitar was forced to do "ludicrous things on her own" without any instruction or assistance. Price described INDOT as a "boys' club" that did not "care for women out there on the road crew. They don't feel that [women] can work as hard as they do. I mean this is not the first investigation of a female highway maintenance worker."

In spite of Price's conclusion, her boss, Janey Trout, instructed Price to avoid any suggestion that Baker had violated Title VII. Trout hoped to avoid liability and "make sure nobody can sue us for violation of Title VII." The disciplinary actions Price recommended, nevertheless, remained the same and were documented in a memorandum dated March 2, 1998, and addressed to Curtis Wiley, INDOT's Affirmative Action Commissioner.

Sitar subsequently received a letter from Price, dated March 10, 1998, stating:

> A careful analysis of the facts indicate that this situation could have created a hostile work environment. Although it was not determined that sex discrimination

occurred, there were enough facts to prompt precautionary measures to be taken.

Baker and Whitworth received a rather different letter from Price, also dated March 10, 1998, stating:

> The results of the investigation did not indicate that any provisions of Title VII of the Civil Rights Act have been violated. Therefore, we are closing this file. Although the facts did not substantiate the allegations, please be advised that the Indiana Department of Transportation will not tolerate or condone harassment or discrimination in the workplace.

When Price found out from Sitar that Baker was boasting to her that he had not done anything wrong, Price became upset. Price got on the phone with one of Baker's supervisors, Steve Risch, to tell him "to get a hold of this guy. You need to let him know that this is not professional behavior. You need to let him know that this could be considered retaliatory."

On March 20, 1998, Baker met with his supervisors, Brad Davis and Steve Risch, at which time they discussed a number of issues, some relating to Sitar and some not. Before the meeting concluded, Davis and Risch brought the March 2 memorandum to Baker's attention. That memorandum stated in relevant part:

> Based on the investigation, there seems to be a misunderstanding by Ms. Sitar of why she was transferred. Due to the circumstances, it is likely that Ms. Sitar did perceive that Mr. Baker was trying to intimidate her. This situation could have created a hostile work environment for her. It is recommended that Mr. Baker receive an informal counseling regarding this situation and that he attend the Progressive Discipline and Ethics for Supervisors training. It is also recommended that management explain the issues and concerns of Ms. Sitar's work performance with her.

Upon reading the March 2 memorandum, Baker became visibly upset. He thought that this memorandum was inconsistent with the March 10 letter he had received, which implied that he had done nothing wrong. According to Davis, Baker (still a probationary employee at this time) also "didn't want it to look like he was performing unsatisfactor[il]y." It was at this meeting that Baker recommended terminating Sitar before the end of her six-month probationary period, because her performance had allegedly not improved after the transfer. Davis and Risch concurred with Baker's judgment. According to Baker, Sitar's termination had nothing to do with the March 2 memorandum.

On March 27, Sitar was terminated. Sitar asked if her termination had anything to do with the affirmative action complaint, which Baker denied. Although Sitar had been generally performing satisfactorily at the Tipton office, Baker cited two additional instances of misconduct—going through a co-worker's desk and personnel files—neither of which he had previously discussed with Sitar and both of which Sitar denies. Price (who was terminated from INDOT on September 21, 1999) stated in her deposition that she believed Baker retaliated against Sitar.

On April 15, Sitar filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). For cause of discrimination, Sitar checked only the retaliation box, stating:

> On March 27, 1998, I was terminated from my position of Maintenance Worker III. Ray Baker told me that I was being terminated because I was a probationary employee and because I couldn't get along with the Westfield crew. The State Affirmative Action Office had completed an investigation of possible sex discrimination against me by him on March 10, 1998, of which he received a summary. I believe that I have been retaliated against for participating in the EEO process, in violation of Title VII of the Civil Rights Act of 1964, as amended.

The EEOC investigator subsequently contacted Baker to respond to Sitar's charges and contacted Price to forward "any and all notes, documents, statements and/or affidavits that were produced during the internal investigation of sex discrimination charges filed by Ms. Sitar."

On September 24, 1998, the EEOC issued its determination, finding that "there is reasonable cause to believe that Respondent discriminated against Charging Party in retaliation for participating in the EEO process when it discharged her." Sitar then brought this action in district court, alleging claims of retaliation, as well as sex discrimination and sexual harassment. The district court granted summary judgment for INDOT with respect to Sitar's sex discrimination and sexual harassment claims, finding that Sitar had failed to allege these claims adequately in her EEOC charge. As for the remaining claim of retaliation, the district court also granted summary judgment for INDOT, finding that Sitar had not satisfied her *prima facie* burden. This appeal followed.

## II

### A.  Sex Discrimination and Sexual Harassment

We first consider whether Sitar is entitled to pursue her sex discrimination and sexual harassment claims at all. Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC. See *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir. 1985). This rule serves two purposes: affording the EEOC the opportunity to settle the dispute between the employee and employer, and putting the employer on notice of the charges against it. *Id.* The only qualification to this principle applies to claims that are "like or reasonably related" to the EEOC charge, and can be reasonably expected to grow out of an EEOC investigation

of the charges. *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (*en banc*). Those claims may also be brought.

In this case, however, Sitar's EEOC charge was limited to her retaliation claim. She checked only the retaliation box on the agency's form and alleged there that her termination was in retaliation for an earlier complaint she had filed about sex discrimination. Normally, retaliation, sex discrimination, and sexual harassment charges are not "like or reasonably related" to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another. See *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) ("Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination."); see also *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110-15 (2002) (emphasizing the separate nature of claims based on specific discriminatory or retaliatory acts for purposes of the limitations period). Those different claims may be so linked, however, where they are "so related and intertwined in time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the Act." *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 368 (7th Cir. 1993).

Unfortunately for Sitar, this is not the unusual case in which a single retaliation charge will support a broader range of claims. Sitar's sex discrimination and sexual harassment claims involve a separate set of incidents, conduct, and people, spanning over a period of time prior to the filing of her complaint and more than three months prior to her termination. See *Ekanem v. Health and Hosp. Corp. of Marion County*, 724 F.2d 563, 573 (7th Cir. 1983); *O'Rourke v. Continental Casualty Co.*, 983 F.2d 94, 97 (7th Cir. 1993);

*Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545 (7th Cir. 1988). While these earlier facts may provide context and support for Sitar's later EEOC charge alleging that her termination was retaliatory, the discrimination and harassment charges are not so closely related that we can justify departing from the general rule of distinguishing among different forms of discrimination. See *Cheek*, 31 F.3d at 500. The fact that both INDOT and the EEOC may have been aware of her earlier, internal complaint about sex discrimination does not change the fact that she chose not to include this issue in her later EEOC charge. We therefore agree with the district court that Sitar's sex discrimination and sexual harassment claims are procedurally barred and move on to consider her retaliation claim.

## B.  Retaliation

Employers are prohibited from punishing employees for complaining about discrimination or other practices that violate Title VII. 42 U.S.C. § 2000e-3(a); *Miller v. Am. Family Mutual Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). Sitar claims that INDOT retaliated against her in two ways: first, by transferring her for complaining about her co-workers' treatment; and second, by terminating her for filing an internal complaint of sex discrimination and sexual harassment with INDOT's Affirmative Action office.

### 1.  Transfer

Sitar claims that her transfer to the Tipton Unit office, where she was relegated to clerical and custodial work, was done in retaliation for her complaint on November 21, 1997, (the day of the ?666" paging incident) about the way her co-workers treated her. At that time, Sitar said to Pedigo and her crew leaders that she was always on "pins and needles,"

and felt that the others were not giving her a chance to do her job and did not want her working there.

The district court found that this claim could not succeed, and we agree. This is not, however, because a change in job responsibilities can never constitute the type of adverse action by an employer that would support a retaliation claim. It all depends on how much of a change, and how disadvantageous a change, took place. Job transfers like Sitar's that lead to significantly diminished responsibilities and substantially changed working conditions can be retaliatory actions. See, *e.g., Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002) (listing cases). Nonetheless, summary judgment was proper here for a different reason: Sitar's complaint did not invoke any action protected by Title VII. Sitar complained only that she felt picked on, not that she was discriminated against "because of" sex or gender, which is what Title VII requires. *Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003). Although an employee need not use the magic words "sex" or "gender discrimination" to bring her speech within Title VII's retaliation protections, "she has to at least say something to indicate her [gender] is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Miller*, 203 F.3d at 1008. *Cf. Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). Sitar conceded that she never told Pedigo that sex discrimination was her real problem. That is enough to doom her claim of a retaliatory transfer.

### 2. Termination

We come to the opposite conclusion with respect to Sitar's claim that her termination was retaliatory. As we noted earlier, on December 17, 1997, Sitar filed a formal com-

plaint of sex discrimination and hostile work environment against Baker and Whitworth with INDOT's Affirmative Action office. A few months later, on March 20, 1998, Baker was meeting with his supervisors (Davis and Risch) to discuss Price's recommendation for Baker himself and Sitar's continued status with INDOT. Baker became upset during the course of that meeting, because he heard for the first time about Price's critical recommendations for him and he thought they made him look bad. At that same meeting, Baker recommended that Sitar be terminated.

In assessing this part of Sitar's case, we follow the standards for retaliation claims announced in *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640 (7th Cir. 2002). The plaintiff may establish a *prima facie* case of retaliation and overcome defendant's motion for summary judgment using either the direct method or the indirect method. Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Id.* at 644.

Under the indirect method, the plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*; *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002); *Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003). If the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for its adverse action. *Id.* Although the burden of production shifts to the defendant under this method, "the burden of persuasion rests at all times on the plaintiff." *Haywood*, 323 F.3d at 531 (citing *Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 280 (7th

Cir. 1985)). Once the defendant presents a legitimate, non-invidious reason for the adverse action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.*

The parties do not dispute that Sitar engaged in protected speech, or that her termination was the type of adverse action contemplated by the retaliation statute. The district court rejected Sitar's retaliation claim for failing to prove causation, because more than three months had elapsed between the filing of her complaint and her termination. Under the circumstances of this case, however, it was error to focus on such a small part of the picture—the time period between the filing of the complaint and the date of termination. We have never said that this factor is dispositive in proving or disproving a causal link. See *Lalvani v. Cook County*, 269 F.3d 785, 791 (7th Cir. 2001) ("[T]emporal proximity is only evidence of causation, not a separate element of the *prima facie* case . . . ."). Here, a trier of fact could find that the causal relationship existed from much more. Baker was visibly upset upon receiving Price's findings and recommendations against him. He decided almost immediately, at the same meeting, that he would terminate Sitar. Price's deposition testimony contains further support for an inference of retaliatory motive. The district court, however, did not think that Price's findings were relevant or that the "coincidental" timing at the meeting was probative. We cannot agree. Sitar's complaint, legitimized by Price's findings, cast a shadow over Baker's performance, and he was embarrassed when he learned about Price's report in the presence of his supervisors. A reasonable jury could find that Baker punished Sitar for complaining about his misconduct, and not because her performance was allegedly unsatisfactory. Therefore, we find that Sitar has established a *prima facie* case of retaliation under the direct method. *Stone*, 281 F.3d at 644.

Finally, even if we thought that there was insufficient evidence of causation, under the indirect method announced in *Stone*, lack of causation should not have been the district court's sole basis for granting summary judgment. In *Stone*, we held that for a plaintiff proceeding under the indirect method, causation would no longer be a part of her *prima facie* burden. *Stone*, 281 F.3d at 644 ( "[P]laintiff so proceeding need not show even an attenuated causal link."). See also *Haywood*, 323 F.3d at 531. Sitar should therefore have been permitted to proceed on the termination part of her retaliation claim.

### III

For these reasons, the judgment of the district court is AFFIRMED in part and REVERSED and REMANDED in part for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

A true Copy:

  Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
