In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3586

LAURA L. ROZUMALSKI,

*Plaintiff-Appellant,*

*v.*

W.F. BAIRD & ASSOCIATES, LTD.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 17-cv-523-jdp — **James D. Peterson**, *Chief Judge.*

ARGUED APRIL 15, 2019 — DECIDED AUGUST 22, 2019

Before WOOD, *Chief Judge*, and BAUER and ST. EVE, *Circuit Judges*.

WOOD, *Chief Judge*. Laura Rozumalski was sexually harassed by her direct supervisor, Mark Riedel. That much is undisputed. Also undisputed is that when Rozumalski reported the harassment to her employer, W.F. Baird & Associates, Ltd. ("Baird"), the company responded by swiftly investigating the incident and firing Riedel. But that is not the end of the

story. This case is about the aftermath of those events and how they culminated in Rozumalski's loss of her own job.

Rozumalski claims that Baird dismissed her in retaliation for her role in Riedel's firing, in retaliation for complaining about her supervisor's continued friendship with Riedel, or as a result of sex discrimination. The district court concluded that no trier of fact could find in her favor. We agree with that disposition: while it may be possible for workplace harassment to haunt a victim's ability to succeed long after the incident, the facts that Rozumalski has presented do not support a finding of retaliation. She has similarly failed to create a jury issue on discrimination. We therefore affirm the district court's grant of summary judgment to Baird.

**I**

Rozumalski started out as a water resources engineer at Baird's Madison, Wisconsin, office in 2010. Riedel was her supervisor. For several years she was generally successful in the position. Then, at an out-of-state work conference in July 2012, Riedel tried to kiss and put his arm around Rozumalski in front of clients. He tried more of the same the next day at the airport. Rozumalski reported the behavior to Baird, and Baird immediately assigned two members of its management team to investigate: Lars Barber and Jeffrey Bellile. Following this inquiry, Baird fired Riedel on August 2, 2012, and then promoted Rozumalski to his former position. Her new supervisor, Alex Brunton, worked out of the company's office in Oakville, Ontario (a suburb of Toronto), and so Barber stepped in as a local manager responsible for her non-substantive supervision.

Rozumalski thrived in her new position. She received positive evaluations, and Baird gave her a significantly larger end-of-year bonus for 2012 than it had expected to award. In the spring of 2013, Rozumalski was promoted again, this time to the position of Leader of Rivers and Watersheds, a more complex job with greater responsibility. She remained under Brunton's supervision for substantive matters and Barber's for local issues.

These background facts are undisputed. What happened next is not. Rozumalski insists that she received only positive feedback about her work as Leader of Rivers and Watersheds. Baird tells a different story. According to Brunton's testimony, Rozumalski struggled with her business development responsibilities and submitted a report that fell grossly below company standards and required significant reworking. According to Barber, Rozumalski was consistently tardy, often arriving at work an hour after most of her colleagues without excuse.

Rozumalski expected smooth sailing for her December 2013 evaluation since, she recalled, Brunton told her in advance to expect "all good things." That is not what happened. The written documents identified several areas where Rozumalski needed improvement, including communication, work quality, business development, and maintaining regular office hours. The parties dispute the overall tone of her in-person review. Rozumalski says the in-person review was far more critical and dismissive than the written documents reflect. Baird says the conversation matched the mixed and (what it characterizes as) the constructive tone of the written documents.

Rozumalski was baffled by what she perceived as a sudden 180-degree shift in Brunton's assessment of her performance. Her confusion cleared away a few weeks later, however, when she learned that when Brunton was in town for her performance review, he had breakfast with none other than Mark Riedel. Rozumalski was convinced that her negative evaluation from Brunton was the result of his breakfast conversation with Riedel. She promptly brought up this suspicion verbally with Barber.

Two months after the December evaluation, Rozumalski received another negative performance review. Brunton and Barber wrote her a letter dated February 18, 2014, in which they charged that her work continued to suffer in the areas of communication, deliverables, and work quality. They provided specific examples to support these concerns.

Rozumalski continued to complain to Barber about Brunton. Eventually Barber suggested that she put her complaints in writing. She did so, in a letter to him dated March 20, 2014, where she explained her suspicion that the relationship between Brunton and Riedel—and perhaps something said at the December breakfast—had poisoned Baird's opinion of her and led to the sea-change in its evaluation of her work. The letter further stated that given the way Riedel "violated" and "disrespected" her, Rozumalski was uncomfortable with any continued connections to Baird. She responded to the criticisms of her performance by suggesting that they were inaccurate or the result of personal animus on Brunton's part. According to Rozumalski, Brunton thwarted her efforts to do her job by cutting her out of meetings and not communicating with her. Brunton testified that Barber shared this letter with him shortly after Barber received it.

At Barber's suggestion, on April 14, 2014, Rozumalski sent a revised version of her March 20 letter to Barber, Brunton, and Bellile, who had taken over Barber's managerial role. On May 1, 2014, Brunton, Bellile, Barber, and Matt Clark (another Baird manager) sent a letter to Rozumalski acknowledging her letters but disagreeing with some of the facts and inferences she had drawn. The May 1 letter reaffirmed the earlier criticisms of Rozumalski's performance. It warned that further debate about her performance would be counterproductive and informed Rozumalski that she was being placed on an Employee Improvement Plan (EIP) to help her with her performance issues. Brunton admits that Rozumalski's complaints, specifically her negative attitude and inability to admit to her performance issues, played a part in the decision to put her on an EIP.

On May 5, 2014, Rozumalski sent what would be her final letter to Baird management. This time, her letter did more than vaguely suggest that a relationship between Riedel and Brunton lay at the source of her struggles at Baird. It explicitly alleged that Brunton was retaliating against her for reporting Riedel's sexual harassment, and it branded her placement on the EIP "punishment" for continuing to "speak[] up" about the suspected ties between Brunton's criticisms of her performance and the July 2012 harassment.

Rozumalski's EIP set forth several strict requirements, including that she maintain regular office hours and inform Bellile if she was going to leave the office other than for her normal lunch break. On June 23, Rozumalski skipped lunch and instead took what turned out to be a 90-minute break in the middle of the afternoon to get her nails done. She did not tell Bellile that she was leaving the premises. While she was gone,

something came up that Brunton claimed needed her immediate attention. Bellile was unable to locate her, though according to Rozumalski he did not try to call her on her cell phone or email her. No matter. Her unauthorized absence in violation of the strict terms of her EIP led Bellile to decide that she had to go. Baird fired her effective June 25, 2014.

## II

Rozumalski followed up with this lawsuit, in which she asserts that Baird retaliated and discriminated against her in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e-3(a), 2000e-2(a)(1). Because this appeal reaches us from a grant of summary judgment in Baird's favor, our job is to take a fresh look at the record.

We begin with Rozumalski's retaliation theory. We must decide whether, construing all the facts in her favor, there is enough evidence to permit a reasonable jury to find that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017).

As she is entitled to do, Rozumalski relies on circumstantial evidence to "supply the causal link … from which a jury may infer intentional discrimination." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Relevant circumstantial evidence may include "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Id.* The key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and

the adverse action. *Ortiz v. Werner Enterprises Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016).

A

Rozumalski's first theory of retaliation revolves around the December 2013 breakfast between Riedel and Brunton. The relevant protected activity allegedly related to that event was her initial report of Riedel's harassment 17 months earlier, in July 2012. Rozumalski suggests that at this breakfast, either Brunton learned about the harassment complaint for the first time from Riedel and it prompted him to retaliate against the woman who got his friend fired, or Riedel—angry about his firing for harassment—told Brunton negative things about Rozumalski that poisoned his opinion of her.

We begin with the first variant: that Brunton learned about the reason for Riedel's firing at the breakfast. At their depositions, Riedel testified that he did not recall the breakfast, and Brunton testified that he remembered it but that Rozumalski's name did not come up. Brunton—who unlike Barber and Bellile did not participate in the investigation into Riedel's harassment—also said that he did not know about Rozumalski's harassment complaints against Riedel until months later, when she explicitly mentioned them in her May 2014 letter. Rozumalski concedes the latter point: she admitted in paragraph 73 of her response to Baird's proposed findings of fact that "Dr. Brunton did not learn of the reasons for Mr. Riedel's termination from Baird, or of the existence of the July 2012 Complaint, until May 5, 2014." Brunton thus could not have retaliated against Rozumalski for the July 2012 harassment complaints until May 2014 at the earliest. By that time, how-

ever, Brunton's concerns about her work were long documented and she was already on an EIP. The only adverse employment action that follows May 2014 is her dismissal.

Another concession, which appears in paragraph 106 of the same document, finishes off this argument. Rozumalski admits that Brunton had nothing to do with the decision to sack her and that "Bellile made the termination decision on his own." If Brunton played no role in the adverse employment action, his discriminatory animus is irrelevant. At a minimum, the person with discriminatory animus must influence the ultimate employment decision enough to be a "proximate cause" of that action, see *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); normally, outside of the "cat's-paw" context, that person must be the decisionmaker, see *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378–80 (7th Cir. 2011). Unless Brunton's alleged animus somehow influenced Bellile—a connection Rozumalski has not made—her complaints against Brunton are beside the point.

Rozumalski does turn to the cat's-paw theory in another version of events she suggests for the December 2013 breakfast between Riedel and Brunton. She argues that Riedel still held a grudge against her for getting him fired, and so he said negative things about her performance to Brunton. (In other words, Riedel used Brunton to "punish" Rozumalski for getting him fired.) She suggests that Riedel's comments soured Brunton's opinion of her at a crucial moment before a performance evaluation and then snowballed.

The district court refused to consider this theory because it found that Rozumalski waived it. We agree with this assessment. In footnote seven of her district-court brief, Rozumalski said:

> Laura's claim for retaliation does not stem from her re-porting the July 2012 assault. Rather, Laura claims that Defendant unlawfully retaliated and discriminated against her for reporting her belief that Brunton was retaliating against her due to his friendship with Riedel, her assailant.

This is not enough to alert the district court to her intent to use a cat's-paw theory. "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered," and if she loses the motion, she cannot make novel points on appeal. *Domka v. Portage County*, 523 F.3d 776, 783 (7th Cir. 2008) (internal quotations and citations omitted). We apply waiver even if "the issue may have been before the district court in more general terms," still holding a party to its responsibility to make "a specific argument." *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010). A cat's-paw theory based on the idea that Riedel took revenge on Rozumalski through Brunton is not the same as a theory that Brunton retaliated in response to Rozumalski's complaints in spring 2014. Rozumalski "has changed h[er] theory after losing below and that prevents us from consider-ing it." *United States v. Ritz*, 721 F.3d 825, 828 (7th Cir. 2013).

B

Rozumalski's second retaliation theory is that she engaged in protected activity in spring 2014 when she complained both orally and in writing about Brunton. Her complaints to Barber throughout that period alleged discriminatory conduct pro-hibited by Title VII, and so, she reasons, any poor treatment by Baird that resulted from those reports violates Title VII.

It does not matter whether the alleged discriminatory con-
duct reported—in this case Brunton's behavior—"was in fact
a violation of the statute," as long as Rozumalski's actions
were "based on a good-faith and reasonable belief" that she
was "opposing unlawful conduct." *O'Leary v. Accretive Health,
Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). Baird says that Rozumal-
ski cannot claim her actions were protected activity because
her suspicions about Brunton were objectively unreasonable.
We need not resolve that dispute, however, since this retalia-
tion claim fails for the same reasons as the previous one: the
timing does not add up, and Rozumalski's admissions pre-
clude it.

The burden-shifting framework from *McDonnell Douglas
Corporation v. Green* can be a helpful way of organizing the
evidence in a Title VII case. 411 U.S. 792, 802 (1973). See *Ferrill
v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir.
2017). A plaintiff wishing to pursue a retaliation claim may
therefore do so by showing that "(1) she engaged in a statuto-
rily protected activity; (2) she performed her job according to
her employer's legitimate expectations; (3) despite her satis-
factory job performance, the employer took an adverse action
against her; and (4) she was treated less favorably than simi-
larly situated employees who did not engage in statutorily
protected activity." *Sitar v. Indiana Dep't of Transp.*, 344 F.3d
720, 728 (7th Cir. 2003). If the plaintiff establishes those ele-
ments, the burden shifts to the defendant to articulate a legit-
imate reason for the adverse action. *Id.* If it does so, the burden
of production returns to the plaintiff to show that the defend-
ant's reason is pretextual. *Id.* The ultimate burden of persua-
sion is at all times on the plaintiff. *Id.*

Rozumalski would like to apply that framework to her case. But she immediately runs into trouble doing so. Even if we assume that she engaged in a statutorily protected activity, she has an insurmountable problem with timing. The negative performance feedback she received in December 2013 predates any of her complaints, verbal or written. She verbally complained to Barber about Brunton and Riedel sometime before February 18, 2014, but Barber did not pass those complaints along to others. The February 18 letter, though signed by Barber, documents Rozumalski's continued performance deficiencies in areas of her job supervised by Brunton. At that point, because of Barber's silence, Brunton knew nothing about the complaints. Barber forwarded the March 20 letter along to Brunton, and all relevant decisionmakers saw the subsequent letters that were addressed to the wider management group. Putting all of this together, by the time anyone other than Barber—most notably Brunton—learned of her complaints, there were already four months of documented performance issues on her record.

Even if we thought that Rozumalski managed to eke out a prima facie case of retaliation, she still cannot prevail, because she made another critical concession. Title VII forbids retaliation, not wrongful or even unreasonable employment actions. The only thing that matters is thus whether a trier of fact could find that Baird did not believe the reason it provided—in other words, that its stated reason was pretextual. We have said that "[a]n inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). In paragraph 59 of her response to Baird's proposed findings of fact, Rozumalski concedes that "Baird believes that Plaintiff's work continued to suffer from various

deficiencies through the first quarter of 2014." In other words, Baird's reasons were not pretextual, and it must prevail.

### III

Rozumalski also asserted that Baird discriminated against her on the basis of her sex in violation of Title VII. The district court granted summary judgment for Baird on this claim, too. Once again using the burden-shifting approach, Rozumalski tried to present a prima facie case of discrimination by showing "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated employee not in the protected class was treated more favorably. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (internal citations omitted). This time, Rozumalski stumbles on the need to point to an adequate comparator.

Determining whether other employees are similarly situated requires a "'flexible, common-sense' examination of all relevant factors." *Id.* at 846 (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). While the comparability of other employees is a context-dependent question often suitable for a jury, when the facts of a case suggest that no reasonable jury could see enough commonality for a meaningful comparison between the employees, summary judgment is appropriate. *Id.* at 846–47. Employees must be similar "in all material respects," including engaging in identical or comparable misconduct, in order to reveal whether differential treatment is occurring. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009).

Rozumalski contends that Riedel and Brunton are similarly situated employees, but each one differs from Rozumalski in critical ways. Riedel's alleged misconduct, inappropriate physical conduct, was quite different from Rozumalski's alleged performance issues. Moreover, unhelpfully to Rozumalski, it was resolved by his firing. The performance deficiencies that she alleges Brunton exhibited (missed deadlines and unreliability) are more like her problems, but the record is lacking critical details about Brunton. We know nothing about the specifics of his alleged performance issues, when they occurred, or who knew about them. Rozumalski's brief spends only a paragraph on this argument. Though she may escape waiver of this point, she cannot avoid a finding that the record lacks enough evidence to permit a jury to find in her favor. Rozumalski finally suggests that she was the only employee put on an EIP in company history, but without evidence that other employees had similar alleged performance problems and yet were not put on an EIP, that contention does little for her. Without an adequate comparator, Rozumalski's prima facie case collapses, and thus summary judgment was appropriate on her Title VII discrimination claim.

## IV

We AFFIRM the judgment of the district court.