**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 11, 2020[*]
Decided May 11, 2020

**Before**

DIANE P. WOOD, *Chief Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-2954

| | |
|---|---|
| KEVIN D. MILLER,<br>    *Plaintiff-Appellant,* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 17-cv-8884 |
| ANDREW M. SAUL,<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | John Z. Lee,<br>*Judge.* |

## O R D E R

Kevin Miller was demoted by the Social Security Administration because he consistently failed to meet his office's productivity standard. After the Merit Systems Protection Board upheld the demotion, Miller sued, challenging that decision and further alleging that the Administration denied reasonable accommodations for his

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. See FED. R. APP. P. 34(a)(2)(C).

visual and mental impairments and discriminated against him based on his race. The district court entered summary judgment for the Administration, and we affirm.

Soon after Miller was reassigned to the Administration's office in Orland Park, Illinois, in November 2014, his new supervisor, Ann Doorhy, began to criticize his productivity. (We construe the facts and draw reasonable inferences in Miller's favor. See *Bridges v. Dart*, 950 F.3d 476, 478 (7th Cir. 2020).) Miller received the standards and expectations for his position at the time of his reassignment. As a paralegal specialist, Miller's main duty was drafting administrative law judges' written decisions on applications for disability benefits. His performance was evaluated in part based on how quickly he produced drafts; he was expected to spend, on average, four hours drafting a favorable decision and eight hours on an unfavorable or partially unfavorable one. In his second month at the new office, Miller produced only 3 written decisions; the average in the office was 18. When Doorhy informed him that he was not meeting the productivity standard, Miller explained that he was distracted—his family home had been destroyed by a fire, prompting his reassignment—and he promised to improve. Doorhy referred Miller to the Employee Assistance Program.

In March 2015, Miller's spouse emailed Doorhy to report that Miller was having headaches and difficulty reading on his work computer; she said it was easier for him to read and edit paper copies of his drafts. When Doorhy evaluated Miller's performance in April 2015, she reiterated that his productivity was "extremely poor" and assigned him a mentor. Miller told his mentor about his headaches, and the mentor responded that he too used to have headaches before he started wearing glasses.

In August 2015, Ron Gryga, Doorhy's supervisor, met with Miller about his productivity. Miller told Gryga that personal issues were still affecting his ability to maintain concentration and focus at work, and Gryga referred Miller for counseling. After the meeting, Miller told Doorhy that he was seeking counseling. Doorhy asked Miller to keep her informed about anything she could do to better support him.

By October 2015, Doorhy placed Miller on a 30-day performance-assistance plan. The written plan again provided Miller with the standards and expectations for his position. Doorhy advised Miller to work on one case at a time (contrary to his reported practice) and advised him not to print his drafts and edit them by hand, which she said was slowing him down. Miller responded that editing on the computer confused him, bothered his eyesight, and caused him headaches and blurry vision; he did not specifically mention that he is nearsighted, has astigmatism, and needs bifocal glasses. Doorhy advised Miller to take whatever steps were necessary to perform his work

electronically and asked if she could help him with his headaches and eye issues. Miller responded "no" because "it was a vision problem." He also told Doorhy that personal distractions were continuing to diminish his productivity.

After this meeting, Doorhy began assigning Miller small cases, one at a time, and gave him specific timeframes to complete each one. Doorhy met with Miller weekly to discuss the improvement plan and to ask how she could help him complete it. Because Miller drafted only 9 decisions during the first month of the plan (the regional average was 25.31), Doorhy extended it. During the second month, Miller drafted 11 decisions, compared to the regional average of 19.50. The next month, he drafted 12 decisions, compared to the regional average of 20.97.

Doorhy then initiated a 120-day "Opportunity to Perform Successfully" (OPS) period from February to May 2016, during which she continued to meet with Miller weekly about his productivity. During this period, Doorhy again provided Miller with the written standards and expectations of the critical elements of his position. Doorhy told Miller that, under the terms of his collective bargaining agreement, if he did not meet the productivity standard by the end of the OPS period, he could be reassigned, given a reduction in pay grade, or removed from federal service.

Miller never met the productivity standard and did not sustain even 80% of it during the OPS period. And whereas during 2015 Miller had produced the second-lowest number of decisions in the office, by the end of 2016 he produced the lowest. After Doorhy informed Miller that he had failed the OPS plan, his productivity declined further, and Miller told Doorhy that he was seeking counseling for depression.

In December 2016, Doorhy proposed demoting Miller to a lower-paying position, citing his failure to write draft decisions at the pace set by the productivity standard. Miller opposed the proposal. He also sought Equal Employment Opportunity (EEO) counseling, alleging that Doorhy had issued unacceptable performance evaluations, proposed his demotion, and harassed him based on his age (over 40), race (African American), and disability (visual impairment). Doorhy confirmed her decision to demote Miller in January 2017, and Gryga approved it. Miller was reduced in grade to senior case technician, a lower paying job.

Miller administratively appealed his demotion to the Merit Systems Protection Board, challenging the validity of the Administration's productivity standard and claiming that it took employment actions against him that violated his union's collective bargaining agreement. He also alleged that the Administration discriminated against

him based on race, retaliated against him, and denied his request for reasonable accommodations for his depression and vision problems. After a hearing, however, the Board found that substantial evidence supported the decision to demote Miller. It explained that the Administration amply communicated its performance standards to Miller, notified him of the inadequacies of his performance, and provided opportunities for him to improve, to no avail. Further, the Board found that changing both Miller's position and pay grade did not violate the collective bargaining agreement, and nothing suggested that the Administration's decision was motivated by anything but his poor performance. Finally, the Board found that Miller failed to show that his visual or mental conditions were disabling or that he could perform his fair share of the work.

Miller then filed this lawsuit seeking judicial review of the Board's decision, which, he said, approved an "invalid" performance standard and misinterpreted his collective bargaining agreement. He also alleged that he was demoted because of his race and denied reasonable accommodations for his visual and mental disabilities.[1] Ultimately, the district court entered summary judgment for the Administration.

Miller appeals. Typically, only the United States Court of Appeals for the Federal Circuit can hear appeals from Board proceedings. See 5 U.S.C. § 7703(b)(1)(A). We have jurisdiction, however, over "mixed cases" that also include claims of discrimination. See *id.* § 7703(b)(1)(B)(2); see also *Kloeckner v. Solis*, 568 U.S. 41, 56 (2012).

## 1. Review of the Board's Decision

We begin with Miller's contention that the Board erroneously upheld his demotion. With respect to this claim, we review the administrative record directly. *Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 499 (1st Cir. 2007). For the most part, our review of the Board's decision is deferential: we must uphold it unless it was arbitrary, capricious, an abuse of discretion, not in accordance with law, obtained without proper procedures, or unsupported by substantial evidence. 5 U.S.C. § 7703(c). However, we review the Board's construction of Miller's collective bargaining agreement, a contract, de novo. See *Lutz v. U.S. Postal Serv.*, 485 F.3d 1377, 1381 (Fed. Cir. 2007).

---

[1] Miller included additional claims of disability discrimination and retaliation, but his appellate briefs do not mention either. Any challenge to the district court's entry of summary judgment for the Administration on these claims is therefore waived. See *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019).

Miller first argues that his demotion was based on a "variable," and therefore invalid, performance standard. Miller points out that Doorhy testified that she wanted Miller to meet 100% of the productivity standard, whereas Gryga testified that if Miller met 80% of the standard, his performance would have been acceptable. Miller argues that because performance standards must provide a "firm benchmark," see *Greer v. Dep't of the Army*, 79 M.S.P.R. 477, 483 (1998), and cannot be increased during performance-improvement periods, see *Brown v. Veterans Admin.*, 44 M.S.P.R. 635, 643 (1990), the Board's decision to sustain his demotion despite this conflicting testimony was an error.

This argument misses the mark. Although Doorhy and Gryga articulated their expectations differently at the hearing, the Board found that the Administration's performance standards were clearly communicated to Miller while he was working as a paralegal analyst. Doorhy described to Miller, in writing and in oral statements, "exactly what he was expected to accomplish and when" on multiple occasions—upon his transfer, in performance reviews, during the initial and extended performance-assistance periods, and during his OPS period. Further, there is no dispute that Miller never sustained even 80% productivity. Therefore, despite any variation in the testimony, substantial evidence supports the Board's decision about Miller's failure to meet the performance standard.

Miller next argues that the Board erroneously interpreted his collective bargaining agreement to allow both reassignment and a reduction in pay. The agreement states that an employee's failure to improve by the end of an OPS period "will result in the employee's reassignment to another position; (e.g., the prior position), or reduction in grade, or termination." Because "or" is always disjunctive, Miller argues, the Administration could take only one of the listed actions after he failed the OPS—but instead it reassigned him *and* reduced his pay.

Miller, however, mischaracterizes the employment action taken against him as two separate ones. The Administration represented to the Board, without contradiction, that reducing Miller's grade necessitated a reassignment. It did not elaborate, but we note that the governing regulation, 5 CFR § 432.103(e) (which the agreement refers to), defines "reduction in grade" as "the involuntary assignment of an employee to a position at a lower classification or job grading level." A reduction in grade, therefore, specifically contemplates the employee's "assignment" to a new "position" to effectuate a reduction in pay grade. (Further, "reassignment" is not separately defined.) Therefore, we agree that the Administration did not violate the collective bargaining agreement.

## 2. Failure to Accommodate

We turn now to the district court's decision on Miller's original federal claims, which we review de novo. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). Miller first contends that the Administration discriminated against him based on his disabilities when it failed to reasonably accommodate his visual impairment and depression, in violation of the Americans with Disabilities Act. See 42 U.S.C. § 12112(b)(5)(A). To avoid summary judgment, Miller needed evidence that he was a "qualified individual with a disability," which his employer was aware of but failed to reasonably accommodate. See *Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018).

First, Miller insists that the Administration refused him the only accommodation for his visual impairment that would have been reasonable: permission to edit his drafts on paper. The Administration was aware of his impairment but did not engage in an "interactive process" with him, he contends, because Doorhy repeatedly denied his requests to print his drafts without offering alternatives or requesting medical information to conduct an individualized assessment of his limitations.

Even assuming in Miller's favor that he was prohibited from printing his drafts (not just advised against it), an employee is a "qualified individual with a disability" only if he is able to perform the essential functions of the job with a reasonable accommodation. See *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014) (quoting 42 U.S.C. § 12111(8)). Miller, however, failed to meet the productivity standard for the many months when he *was* printing drafts to edit. Doorhy advised Miller to stop printing only after she began trying to improve his performance. Because Miller lacked evidence that he could perform the essential functions of his job with the requested accommodation, his claim fails. See *id.* at 489–90.

Miller's claim based on his mental limitations also fails, for two reasons. First, Miller contends that once he informed Doorhy that he was undergoing counseling, she had a duty to develop an accommodation for his depression. But even assuming that a reference to "counseling" was enough to put Doorhy on notice of a disability, Miller did not ask for any accommodation, and the law does not require an employer to volunteer one when none is requested. See *Guzman*, 884 F.3d at 642. Second, Miller testified that he could not think of any accommodation that the Administration could have offered to assist with his mental condition. But a plaintiff pressing a failure-to-accommodate claim must "show that a reasonable accommodation could be made that would enable [him] to carry out the essential functions of [his] job." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014). Because Miller did not ask for an accommodation and could

not posit one that would have helped him, no jury could find that the Administration failed to reasonably accommodate his depression.

### 3. Race Discrimination

Finally, Miller argues that he provided sufficient evidence that the Administration demoted him because he is African American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(a). Miller maintains that he established a prima facie case of racial discrimination under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To do so required evidence that, among other things, Miller met his employer's legitimate expectations. *Rozumalski v. W.F. Baird & Assocs.*, 937 F.3d 919, 927 (7th Cir. 2019). The district court concluded that he did not. But Miller argues that whether he met his employer's expectations should not matter. A reasonable jury could conclude that the Administration did not apply its performance standard as strictly to a white employee, he contends, and it could therefore infer that the standard was merely a pretextual cover for the Administration's true, racially discriminatory motive, see *Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012).

But as the district court also concluded, the white coworker who performed poorly and was not demoted did not perform *as* poorly as Miller; Miller consistently performed worse. To reveal discriminatory discipline, a plaintiff must produce evidence that he engaged "in identical or comparable misconduct" but received harsher punishment. *Rozumalski*, 937 F.3d at 927. Here, however, in 2015, the white employee produced enough decisions to meet 81% of the performance standard, whereas Miller produced enough to meet only 58% of it. And in 2016, she met 83% of the performance standard, compared to Miller's 65%. Because Miller and the white employee did not engage in comparably poor performances, Miller lacked sufficient evidence to create a genuine issue of material fact that the Administration held him to a higher standard. See *id.* at 927–28. And Miller points to no other evidence from which a jury could reasonably infer that his race caused the Administration to demote him. See *Ortiz v. Werner Enters.*, 834 F.3d 760, 763 (7th Cir. 2016).

AFFIRMED