In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1933

LINDA BROOKS,

*Plaintiff-Appellant,*

*v.*

AVANCEZ,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:19-cv-00515-HAB — **Holly A. Brady**, *Judge.*

ARGUED JANUARY 6, 2022 — DECIDED JULY 6, 2022

Before SYKES, *Chief Judge,* and ROVNER and SCUDDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Linda Brooks filed a lawsuit claiming that her employer, Avancez, discriminated against her on the basis of her age and disability, PTSD. Avancez, on the other hand, claims that it fired her for legitimate non-discriminatory reasons—primarily because of threats that she made to other employees in the workplace. Because Brooks has not provided evidence that the employer's stated reason for her

discharge is pretext for illegal discrimination, we affirm the district court's grant of summary judgment along with its denial of her motion to amend the complaint to add a claim for intentional infliction of emotional distress.

**I.**

In June 2018, Brooks began working at Avancez as a temporary employee assigned through an agency. She was assigned to the third shift of something called the "console line" which had eight different stations. Brooks worked at the "Continuity and Final Inspection Station." Her duties included testing the electronics and inspecting each console before shipment to a car manufacturer for use in its production line. Brooks was the oldest assembler on the shift. On September 26, 2018, Avancez hired Brooks as a permanent employee.

Brooks' discrimination claim is based on several incidents during her employment and surrounding her termination. We recount these incidents with facts taken in the light most favorable to Brooks, as we must during summary judgment. *Taylor v. Ways*, 999 F.3d 478, 482 (7th Cir. 2021).

According to Brooks, shortly after being hired, she participated in a two-day orientation and training session for new employees. Brooks claims that the trainer asked all of the participants to state their names and ages, and Brooks complied. A few months later, after her initial training, on October 29, 2018, Brooks informed her team lead, Linda Chambers, that she was supposed to be, but had not been, trained on other stations. The third shift plant manager, Keith Redd, chimed in asking Chambers why Brooks was not being trained on other stations. According to Brooks' account, Chambers responded that Brooks would not be trained on all of the eight

workstations in her area because "they said she is too old." R. 47 at 4, ¶26. At no point in this suit has Brooks identified the "they" of this statement. Redd immediately corrected Chambers' characterization by confirming that Brooks should be trained on all other stations. Nevertheless, the next day, Brooks filed a complaint with human resources complaining of a "hostile work environment." R. 65-9 at 9.[1] Brooks testified in her deposition that she was fully trained on all but one station as of April 2019. R. 65-15 at 21, 25 (Dep. pp. 81–83, 97–98).

Brooks also claims that two other employees, Tiffany Crawford and Christeena Goodwin, would "regularly" make statements about Brooks being old and slow. According to Brooks' testimony at her deposition, "regularly" meant that Crawford made age-related comments more than twice, but less than ten times and Goodwin made age-related comments "a couple of times"—at least twice, but less than ten times. R. 65-15 at 28–29 (Dep. pp. 111–13). Brooks did not have specific examples of their comments but rather described in general that the two made statements that were about Brooks being old and slow.

In addition to these age-related incidents, Brooks' disability claim stems from the events surrounding her termination.

---

[1] Although the complaint she sent to human resources does set forth the contention that her team lead said she was too old to train, the bulk of the document contains generalized complaints about work assignments and perceived disrespect from the team lead. Brooks did not sign the document, but shortly after she submitted it, the plant manager, Redd, asked her if she was the one who had submitted an unsigned complaint to human resources. Brooks responded that she had forgotten to sign the complaint, and Redd assured her that he would put her name on it for her. The copy of the document in the record is unsigned. R. 65-9 at 9.

On February 6, 2019, Brooks went to the office of Chad Pieper, the human resources manager, to look at her human resources record due to confusion about what had become of her October complaint after she submitted it. (*See* footnote 1, supra). After she had been in the office for five to ten minutes, Steve McGuire, the third shift supervisor, entered the room to discuss a conflict that had arisen between Brooks and a co-worker the night before. During the course of the meeting, Brooks stated that she had PTSD. What followed next is disputed. According to Brooks, whose version of events we must credit, she testified at her deposition, "I'm, I'm a service connected veteran, and I have PTSD, and I've been experiencing a lot of hostile, um, environmental-type situ … incidents that I wrote about and one of the statements was missing out of my file, and I wanted to know why it wasn't there." R. 65-15 at 31 (Dep. p. 124). According to Avancez manager Pieper, Brooks said to McGuire, "[I] have PTSD and anything can happen." *Id.* at 32 (Dep. pp. 127–28). Brooks denied that she made that statement, but concedes that during the meeting, after she made the statement about her PTSD, Pieper said "You just threatened Steve … . You said you had PTSD and that anything could happen." *Id.* (Dep. p. 127). In other words, taking the facts in the light most favorable to Brooks, she denies that she made the threat to McGuire, but admits that Pieper accused her of making a threat to McGuire in the form of the statement "[I] have PTSD and anything can happen." *Id.* at 32 (Dep. p. 128).[2] Pieper prepared and issued an oral

---

[2] According to McGuire, who also made notes of the incident, she said to him "I have PTSD and I can't help what might happen to you." R. 56-3 at 248. Once again, we credit Brooks' version of the facts, but note others' documentations of the statements for evidence of pretext or lack thereof.

warning to Brooks and then drafted a written disciplinary statement documenting the threat, which Brooks refused to sign. According to Brooks, Pieper informed her that she could be terminated for failing to sign the disciplinary form.

Shortly after the February 6 meeting and the dispute about the threat, Brooks wrote a letter to the CEO, with the following subject line: "AGE DISCRIMINATION." The letter complained of age discrimination, a hostile work environment, and stated that harassment by co-workers was causing her PTSD to "go into relapse." R. 65-9 at 13. In response to her letter, the director of team member relations, Andrea Bouchard, met with Brooks in person. According to Brooks' complaint, Bouchard told her that if things were so bad, Brooks should "find a job somewhere else." R. 47 at 6, ¶45.

Approximately one month later, on March 12, 2019, Brooks received a three-day suspension for bypassing a quality-control system meant to detect errors in products. The director of team member relations reviewed a surveillance video of the event in which a co-worker called Brooks to her station for help scanning a part. Brooks took the correct part off a shelf, scanned it and then put it back on the shelf without replacing the faulty part on the console. Brooks does not dispute the substance of the video recording, but rather disputes only who was to blame for the error. According to Brooks' account of the event, she "demonstrated the assembly, only, and she expected the assembler to correctly process the part." Brooks' Brief at 10. She does not explain why she placed the correct part back on the shelf. She argues that Avancez refused her request "to produce the CSN number which would have verified the error," but she does not explain what a CSN number is, what it means to "verify an error," or how it would

have altered management's assessment that she had bypassed a quality control measure. *Id.* This incident is not listed in the termination paperwork that Avancez prepared when it terminated Brooks, and as far as we can tell and discuss below, Avancez does not rely on it as justification for Brooks' termination in this suit. Instead, it appears that Avancez describes this incident and the resulting disciplinary action to demonstrate that Avancez had a legitimate, non-discriminatory reason for suspending Brooks in March 2019, and that she was not being singled out for adverse employment actions based on her age or disability.

The final episode leading to Brooks' termination began with a May 9, 2019 dispute between Brooks and a co-worker. Brooks complained to the Human Resources Department that the team lead, Chambers, had cursed at her. Chambers, in turn, complained to the supervisor that after a disagreement, Brooks threatened her by saying "we can take it outside." R. 56-3 at 256. The following day, May 10, the shift supervisor directed Brooks to a meeting with a human resources assistant, Kathy Marburger, and a Union Committee Chairperson, Teresa Braden. Brooks contacted her UAW representative, Todd McKibbon, and asked him to attend as well.[3] During that meeting both Marburger and Braden heard words that they interpreted as a threat to McKibben. Brooks alleges that she said, "please help me or do I have to go to another organization to receive help with this harassment." R. 47 at 7, ¶52.

---

[3] The parties sometimes refer to the meeting as occurring on May 9, and sometimes on May 10. As far as we can tell, the incident between Brooks and Chambers occurred on May 9, and the meeting followed the next day, on May 10. We use these dates even when the parties' briefs have described them otherwise.

It is undisputed that shortly after it was uttered, Braden accused Brooks of threatening McKibben. *Id.* at ¶53; R. 65-15 at 45 (Dep. pp. 177–78). And in response to Brooks' denial, Marburger said, "Yes, you did threaten him, I'm going to terminate you." R. 65-15 at 45 (Dep. p. 178). McKibben, for his part, denied being threatened.

Avancez initially suspended Brooks while investigating the episode, and then terminated her on May 24, 2019. The termination paperwork stated that she was being terminated for making threats, for disrespectful and disruptive conduct and attitude and for insubordination for failing to sign personnel meeting notes.[4] One further clarification is worthy of mention: Brooks' brief states that in its answers to interrogatories, Avancez added additional reasons for the termination, namely, that she was also terminated for bypassing a quality control measure. *See* Brooks' Brief at 12. Although the outcome of this case does not depend on us pinning this issue down, it is worth noting that Avancez did not add this as a reason for termination in the answers to the interrogatories. The answers to the interrogatories state as reasons for her termination: "Defendant states that Plaintiff was terminated for legitimate, non-discriminatory reasons set forth in her termination paper work, … in particular, making threatening remarks to her team lead, supervision and union representatives culminating in her termination in May of 2019." R. 65-9 at 18. And also, "Subsequent to this[,] Plaintiff was suspended for non-threat based misconduct of bypassing safety

---

[4] According to the Collective Bargaining Agreement employees are required to sign all written reprimands and warnings, not as an admission to the substance of the notes, but as recognition of receipt of the document. R. 56-3 at 209.

protocols in March 2019. Ultimately, she was terminated for her threats in May 2019." R. 65-9 at 20.[5]

In our chronological presentation of the facts, we have skipped over several of Brooks' complaints of incidents of poor treatment by co-workers where workers used profanity, refused work assignments, or violated work rules. These include a time when a co-worker refused Brooks' instructions and said, "I am not doing that shit[.] You're not my supervisor," (R. 65-9 at 10), and another where a co-worker told her "Fuck you" and then later refused to assist Brooks on the line. R. 65-4 at 28. In a third incident, Brooks received conflicting instructions from supervisors, one of whom, along with a co-worker, cursed at Brooks. Brooks describes a few other incidents in which she believes co-workers escaped punishment that Brooks felt was due. Brooks does not make any connection between the profanity and disrespectful behavior and her age or disability. Brooks does not describe ways in which those other workers were similarly situated to her or how their misdeeds were similar in nature to the ones for which she was discharged. We discuss below what, if any, impact these incidents have on her claims.

---

[5] *But see* R. 56-2 at 6. Although not part of the answer to the interrogatories nor argued in the briefs, director of team member relations, Bouchard, stated in her affidavit "[t]he reason for this decision [Brooks' termination] was based not only on the most recent conduct by Brooks in May of 2019, including threatening remarks to co-workers and [a] union representative, but her prior written discipline for making an earlier threat to members of management and her three day suspension for quality, coupled with her ongoing refusal to adhere to Avancez's expectation that team members sign off on receiving discipline resulted in the decision to terminate employment."

## II.

### A. Age and disability discrimination claims.

Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are all merely convenient ways to organize our thoughts as we answer the only question that matters: when looking at the evidence as a whole, "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because we are evaluating this question in the context of Avancez's motion for summary judgment, our task is to look at the facts in the light most favorable to Brooks and determine whether Avancez is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). We review the district court's grant of summary judgment under the de novo standard of review. *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022).

With that said, we can begin by looking simultaneously at Brooks' claim of disability discrimination under the Americans with Disabilities Act (ADA), age discrimination under the Age Discrimination in Employment Act (ADEA), and retaliation claims under both Acts, as they may all be evaluated together. For each of these claims, we must begin by determining whether Brooks belongs to a class of people protected by the corresponding statute. In the case of the ADEA, that analysis is straightforward. The ADEA protects workers who are forty years old and older from discrimination based on age. *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020). The ADA requires a bit more. Section 12112(a) of the

ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation of § 12112(a), Brooks must show (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability. *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020). Finally, for a retaliation claim, Brooks must show that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (internal quotation and citation omitted).

The plaintiff proceeded under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which can be a helpful way to evaluate evidence of discriminatory intent in employment discrimination claims. The framework is the same for each claim. Brooks can make a prima facie case of discrimination by demonstrating that (1) she is disabled under the ADA and/or protected under the ADEA and/or engaged in a statutorily protected activity; (2) she performed her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. *Tyburski*, 964 F.3d at 598 (ADEA); *Rozumalski*, 937 F.3d at 926 (retaliation); *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (ADA). If Brooks successfully establishes a prima facie case of

discrimination using these steps, then Avancez must produce evidence demonstrating that it took the actions Brooks complains of based on legitimate, nondiscriminatory reasons. If successful, it falls to Brooks to demonstrate that Avancez's reason is pretextual—that is, an attempt to mask a discriminatory reason with a legitimate excuse. *Tyburski*, 964 F.3d at 598 (ADEA); *Rozumalski*, 937 F.3d at 926 (retaliation); *Hooper*, 804 F.3d at 853 (ADA).

Under the third step, there is no dispute that Brooks' termination qualified as an adverse employment action. Turning to the first prong of the *McDonnell Douglas* framework, Brooks was in her mid to late 50's at the relevant times of this suit and therefore is covered by the ADEA. Although the district court had "serious questions" as to whether the plaintiff was disabled under the ADA, it accepted for summary judgment purposes only, as do we, that Brooks was disabled as defined by the ADA. *Brooks v. Avancez*, No. 1:19-CV-515-HAB, 2021 WL 1535300, at *5 n.3 (N.D. Ind. Apr. 19, 2021).

Brooks alleges that she engaged in protected activity when she complained of age discrimination. We see plenty of evidence of this. She submitted a complaint to human resources that complained of age discrimination, she wrote to the CEO complaining of age discrimination, and complained to the director of team member relations of age discrimination.

We do not, however, see any evidence as presented by Brooks that she complained of disability discrimination. Brooks claims that she complained about disability discrimination four times: to human resources in her unsigned complaint on October 29, 2018; when she complained to Pieper on February 6, 2019; in her letter to the CEO in mid-February; and the follow up with director of team member relations,

Bouchard. Brooks' Brief at 25. The October 29, 2018 complaint, however, does not make any mention of PTSD or any other disability. It complains only of Chambers' statement that she was too old to train and other complaints about rude, disrespectful, and unprofessional behavior by co-workers. According to Brooks' facts, her first mention of PTSD occurred at the February 6 meeting when she stated, "that she was a U.S. Army service connected veteran diagnosed with PTSD and that the hostile environment was affecting her mental health." R. 47 at 5, ¶36. Thus, Brooks' statement at the February 6 meeting was not a complaint of disability discrimination, but rather a statement that other situations in the workplace were exacerbating her PTSD, namely age discrimination, and unprofessional and disrespectful behavior by her co-workers. As for the February 15 letter to the CEO, it would be hard to describe that communication as a complaint about disability discrimination. In fact, that letter has at the top "SUBJECT: *AGE DISCRIMINATION*." R. 56-3 at 254. The only mention of her PTSD in that complaint is that "the retaliation, harassment I am experiencing [based on age] has cause [sic] my U.S. Army Service Connected Disability PTSD to go into relapse." *Id.* Once again, this was not a complaint that she was being discriminated against based on PTSD, but rather a complaint that age discrimination was exacerbating her preexisting PTSD condition. And finally, Brooks states that she discussed disability discrimination with Bouchard in mid-February, but in her deposition she recounts that she discussed with Bouchard only the threats, cursing, and invasion of her personal space. *See* R. 65-15 at 35–37 (Dep. pp. 137–48). Taking all of the facts as Brooks alleges, although she informed her employer at some point that she suffered from PTSD, we do not see any evidence in the record, taken in the light most favorable to

Brooks, that she ever made any complaints to anyone in Avancez's management that she was being discriminated against based on her PTSD. At the end of the day, these details do not have any impact on the outcome of this case, because, as we noted in *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002), "[i]t is not always necessary to march through this entire process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof." *Id.*

In some cases, the inquiry about whether an employee is meeting the employer's legitimate work expectations overlaps with the question of pretext. Where legitimate expectations and pretext overlap, we can be more efficient by addressing both together rather than first determining whether there is a prima facie case of discrimination and then turning to pretext. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010). And, in fact, this is more in keeping with the "whole evidence" outlook espoused by this court in *Ortiz*, 834 F.3d at 764–65. If the employer offers a non-discriminatory reason for the termination and we determine the reason is not pretextual, we can skip the remaining analysis of the prima facie case. *See Adelman–Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). In this case, the question of pretext and employer expectations do indeed overlap. Brooks was not meeting Avancez's legitimate expectations if she was making threats and refusing to follow company rules. These are non-discriminatory reasons for termination. *See Everroad*, 604 F.3d at 478. But were they pretextual in this case?

Pretext means "more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th

Cir. 2015) (*citing Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). The plaintiff must demonstrate pretext by a preponderance of the evidence. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). If Avancez "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022). "In determining whether the employer's reason can be characterized as pretextual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson*, 949 F.3d at 378; *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason."). Because courts are not super-personnel departments who sit in judgment of management decisions, it is of no moment if the employer's reasoning is incorrect, "foolish, trivial or even baseless." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 879 (7th Cir. 2001). "[A]arguing about the accuracy of the employer's assessment is a distraction … because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest*.'" *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 744 (7th Cir. 2002) (*quoting Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (emphasis in original)). In other words, it does not matter if Brooks' words should have been perceived as threats or whether they even occurred; the only question is whether the employer honestly

believed it had a non-discriminatory reason for termination—
that is, that Brooks made threats.

In this case, Brooks concedes that in both incidents man-
agement immediately asserted that Brooks had made threats.
R. 65-15 at 32, 45 (Dep. pp. 125, 177–78); R. 47 at 5, 7, ¶¶37, 53.
The immediacy of Pieper's assertion at the February 6 meet-
ing, and Marburger and Braden's joint assertions at the May
10 meeting reflect a level of reliability. They had no time to
collude or deliberately misrepresent but acknowledged the
threat immediately on the heels of the utterance. One might
analogize to the hearsay exception for present sense impres-
sions in which "we generally credit the proposition that state-
ments about an event and made soon after perceiving that
event are especially trustworthy because 'substantial contem-
poraneity of event and statement negate the likelihood of de-
liberate or conscious misrepresentation.'" *Navarette v. Califor-
nia*, 572 U.S. 393, 399–400 (2014), (*citing* Advisory Committee's
Notes on Fed. Rule Evid. 803(1), 28 U.S.C. App., p. 371) (de-
scribing the rationale for the hearsay exception for "present
sense impression[s]"). Moreover, the termination paperwork
signed by management on May 24, 2019, after the company's
management had time to review its policies, also lists the
threats as the first reason for termination (along with poor
conduct and attitude and insubordination for failure to sign
personnel meeting notes describing the threats). Finally, after
Brooks filed a union grievance, a union representative inter-
viewed Brooks and his notes reflect that Brooks admitted say-
ing "I am Service Connected[.] I have PTSD and anything
could happen." R. 56-3 at 250. The union representative, after
interviewing other people who were present at the May 10
meeting, also found evidence that Brooks made similar state-
ments at that May meeting. We do not credit this union

investigation as proof that the statements occurred. That, of course, would be a fact issue for trial and, in any event, a union investigation is separate from this proceeding. But the notes of that investigation, which are in this record, do bolster Avancez's position that people present at the meeting *believed* that Brooks issued a threat. Whether or not that threat occurred is not important for our purposes.

We do not dismiss the possibility that an employer's preconceived stereotype of a particular worker might influence what the employer hears or claims to hear in such an interaction. An employer who harbors hidden or open prejudice toward women, for example, might hear "abrasiveness" or "rudeness" in her speech, or stereotypes of an immigrant group might color how an employer views an employee's work product. Guessing at an employer's hidden animus or inner prejudice, however, is not enough to defeat summary judgment. The employee must support her hunch with evidence. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (a plaintiff cannot thwart summary judgment by speculating as to the defendant/employer's state of mind). If Avancez's decision-makers harbored some discriminatory prejudice about people with PTSD that altered their interpretation of Brooks' comment and made them believe it was a threat when it was not, Brooks has not presented a thread of evidence to support this theory. In fact, the only adverse employment action that she claims was based on PTSD was her termination for making a threat and using her PTSD as the excuse for making it.[6]

---

[6] Brooks does not allege that her employer labeled her as having trouble getting along with co-workers or making threats based on a perception about age.

In sum, Avancez has met its burden of production by providing a non-discriminatory reason for termination—that it earnestly and honestly believed that Brooks had threatened co-workers. Brooks' evidence of pretext, on the other hand, is both scattershot and not relevant to the adverse actions that form the basis of her complaint. For example, she claims as evidence of pretext that Avancez selectively enforced its policies against her but not others. *See Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012). When a plaintiff claims that she was disciplined and a similarly situated employee was not, the plaintiff must show not only that the two employees engaged in similar conduct (including considerations of differentiating or mitigating circumstances), but also that the conduct was material to the adverse employment action. *Antonetti v. Abbott Lab'ys*, 563 F.3d 587, 592 (7th Cir. 2009). Brooks' examples do not provide apt comparisons to her conduct, nor do they offer sufficient evidence of pretext.

For example, Brooks spends some time in her brief arguing about allegedly similarly situated employees who hurled rude statements and disrespectful profanity around the workplace and yet were not disciplined despite Brooks' own conclusion that the "co-workers' conduct was worse than [her own]." Brooks' Brief at 18. Rude and disrespectful behavior, however, is not at all the same as making threats. In fact, under the collective bargaining agreement, profanity falls under the category of "conduct and attitude" and does not even call for a written warning on the first offense. R. 56-3 at 243–45. Making threats, on the other hand, calls for an immediate

three-day suspension for the first offense and discharge for the second offense.[7] R. 56-3 at 241.

Brooks also argues that she was improperly disciplined for insubordination for not signing notices of disciplinary action (what the parties call "write-ups") because the CBA either did not require a signature during the time at issue, or did not set forth punishment for failing to do so. Brooks is conflating two events. Brooks claims that Pieper threatened to terminate her after she refused to sign the write-up following the February 6, 2019 meeting, despite the fact that the requirement to sign "write ups" was not an offense until the Collective Bargaining Agreement went into effect six weeks later, on March 21, 2019. But Brooks was not, in fact, terminated or disciplined in any way for failing to sign this write-up on February 6. R. 65-15 at 35 (Dep. p. 138). The termination paperwork that management signed on May 24, 2019, on the other hand, did indeed list insubordination for failure to sign the write up from the May 10 meeting. R. 56-3 at 261. Brooks concedes, however, both that she refused to sign those notes and that by May 24, 2019, the CBA required that employees "must sign all written reprimands and warnings." See Brooks' Brief at 9–10 (*citing* R. 56-3 at 209).[8] Failure to meet a requirement of the CBA is, in fact, insubordination whether or not the disciplinary

---

[7] An employer's efforts to take workplace threats seriously is not without reason. In 2019, 20,870 workers in private industries experienced non-fatal workplace violence, and 453 were killed. Nat'l Inst. for Occupational Safety and Health (NIOSH), https://www.cdc.gov/niosh/topics/violence/fastfacts.html.

[8] Brooks' brief erroneously cites to page 237 of this document, but the point she references in the CBA appears on page 209 of that document. *See* R. 56-3 at 209 (p. 13 of the CBA).

consequence for the offense is set forth explicitly in the CBA. More generally, this is not an example of selective enforcement, but rather, it is an argument that the employer wrongly disciplined Brooks. As we have established, however, the wisdom or propriety of an employer's discipline is a distraction; the "question is not whether the employer's reasons for a decision are right but whether the employer's description of the reason is honest." *Jones*, 302 F.3d at 744 (internal citations omitted) (original emphasis omitted). Thus, even if Pieper had erroneously disciplined Brooks in February 2019 for failure to sign the discipline report prior to the effective date of the CBA (and Brooks concedes he did not), his error alone was not pretext for discrimination. There is no evidence that other employees were not asked to sign their disciplinary actions or not disciplined when they refused.

Brooks also claims that she was wrongfully accused of and disciplined for soliciting on the job, whereas another employee solicited on the job and was not disciplined. This incident did not lead to her termination, and although her supervisor made notes about it, those notes specifically state "[t]his is not a write up." R. 65-4 at 30. Other than providing a photocopy of a Girl Scout cookie order sheet (R. 65-4 at 31), Brooks has not provided any facts from which we might assess whether the other employee was similarly situated and whether Brooks was treated more harshly than her co-worker.

Brooks' brief also contains a section which she labels "ADEA Pretext and Direct Evidence of Discrimination." Because we now view evidence as a whole without divisions between direct and indirect evidence (*See Ortiz*, 824 F.3d at 765–66), we can evaluate her claims of direct evidence of discrimination in the same breath as we look together at pretext and

satisfactory job performance. Brooks claims that her direct evidence of discrimination is twofold: her allegation that her team lead, Chambers, said she was too old for training, and her co-workers' taunts that she was old and slow.

According to Brooks' own narrative, however, after Chambers made the comment about Brooks being too old to train, someone who outranked Chambers, supervisor Keith Redd, immediately and clearly corrected Chambers and stated that Brooks should be trained on all the stations on the production line. And, in fact, Brooks conceded that following that conversation she did receive training on all of the units of the line and believed, by April 2019, she received training on all but one station. In short, if there was any confusion by a co-worker that she was too old for training, it was quickly remedied by a supervisor.[9] The only evidence in the record about training comes from an Avancez training chart which shows that Brooks had as much or more training than all of her co-workers, other than the team lead. R. 56-3 at 247. In fact, during her deposition her only objection to the training document was that she had more mastery of the equipment than the document indicated. *Id.* at 45–47. The district court concluded that it "could not find, as a matter of law, that Plaintiff has suffered a discriminatory failure to train when, in fact, she was one of the best trained individuals on her shift." *Brooks*, 2021 WL 1535300, at *9. We agree.

---

[9] Brooks alleges that Chambers was a supervisor and not a co-worker; even if this is true, Chambers' error was immediately corrected by a supervisor with greater authority. We discuss the co-worker/supervisor distinction further below.

As for the comments by Chambers, Crawford, and Goodwin that she was old and slow, these kinds of remarks can raise an inference of discrimination if they are made by a person with decision-making power over the adverse employment action at issue and are made around the same time and in reference to that decision. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016). Brooks argues in her reply brief that Chambers was a supervisor. Putting aside the question of waiver, we can conclude that as a matter of law Chambers was not a supervisor. A supervisor is someone who can affect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (*quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). We know that Chambers had none of these powers because in her May 9 complaint to management, she stated that she asked to have Brooks removed from her line and team four times without management heeding her request. R. 56-3 at 257. Moreover, even if she were a supervisor, there was a clear break between any of her requests to remove Brooks from her line, or the ageist comments and the independent action—the threats—that ultimately led more senior management to terminate Brooks. *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) ("[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action … then the employer will not be liable.").

Discriminatory behavior by non-decisionmakers can, in some cases, form the basis of an age discrimination claim where the subordinate without decision-making authority has such influence over the decisionmaker that she is able to

use her discriminatory actions to manipulate the decision-maker into taking the adverse employment action. *See id.* at 420–21. To show age-based discrimination under this "cat's paw" theory of liability, Brooks must have evidence that the biased non-supervisor actually harbored discriminatory animus against her and that the employee's scheme proximately caused her termination. *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021).[10] Brooks' theory is that her supervisory co-worker, Chambers, influenced Avancez to terminate Brooks because Brooks "complained about not being trained and harassment." Brooks' Brief at 24.

Chambers' unheeded requests to have Brooks removed from her line demonstrated her inability to influence Avancez's decision. Moreover, Avancez's management made the decision to terminate Brooks after reviewing her history of making threats to co-workers, her prior discipline for making an earlier threat, and her refusal to sign off on the discipline report. R. 56-2 at 5; R. 65-9 at 25. Chambers' complaint could not have been the proximate cause of Brooks' termination because management conducted its own independent investigation and evaluation of Brooks' employment history and terminated her based on other information, in particular,

---

[10] As described by the Supreme Court, "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub*, 562 U.S. at 415 n.16. This theory describes a situation in which a lower-level employee influences or manipulates the employer into taking discriminatory actions.

that she had threatened Avancez employees. Moreover, even if Avancez took Chambers' complaints into account, "the decisionmaker is not required to be 'a paragon of independence.'" *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (*quoting Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009)). An employer may avoid cat's paw liability if the decisionmaker "is not wholly dependent on a single source of information" and conducts her "own investigation into the facts relevant to the decision." *Martino*, 574 F.3d at 453 (internal quotations and citation omitted). If "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action … the employer will not be liable." *Staub*, 562 U.S. at 421. We conclude that neither Chambers' complaints nor the other employees' age-related comments singularly influenced Avancez to terminate Brooks. Avancez terminated Brooks because of its honestly held belief that Brooks issued threats in the workplace.

In short, all of Brooks' arguments fail on the same grounds. For all of these claims—ADEA, ADA and retaliation—a plaintiff must prove, by a preponderance of the evidence, that the protected category or action was the "but-for" cause of the challenged adverse employment action. *Sinha*, 995 F.3d at 573 (ADEA); *Kurtzhals*, 969 F.3d at 728 (ADA);[11]

---

[11] We have noted that the ADA Amendments Act of 2008 changed the language of the statute from prohibiting discrimination "because of" a disability to prohibiting discrimination "on the basis of" a disability. *See* Pub. L. No. 110-325, § 5(a)(1) (Sept. 25, 2008). Our circuit still has not determined definitively whether the changes affect our interpretation of the ADA as requiring "but for" causation, but we continue to assume that "but for" causation is required. *See Kurtzhals*, 969 F.3d at 728; *Monroe v. Ind. Dep't of Transport.*, 871 F.3d 495, 504 (7th Cir. 2017) (*citing Serwatka v.*

*Rowlands v. United Parcel Serv.—Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (retaliation). In this case, whatever else was happening in the workplace, the plaintiff would have been terminated because Avancez had the honestly held belief that Brooks made threats of violence to other employees. Thus, even taking all of the facts in the light most favorable to Brooks, and making all reasonable inferences in her favor, she has not met her burden of persuading this court that Avancez's stated reason for terminating her was pretextual. More generally, a reasonable factfinder could not conclude that PTSD, age, or protected activity caused her discharge. *See Ortiz*, 834 F.3d at 764–65.

The remainder of Brooks' arguments are all aimed at proving that she did not actually issue a threat at the May 10, 2019 meeting. Once again, however, the pivotal question is whether Avancez believed that Brooks issued a threat. And as we noted, Brooks concedes that in both the February and May meetings, management told Brooks that she had made a threat.

## B. Hostile work environment claim.

Supreme Court cases recognize that discrimination in the workplace can emanate not only from the terms and conditions of employment, but also when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523

---

*Rockwell Automation, Inc.*, 591 F.3d 957, 961 n.1 (7th Cir. 2010)); *Roberts v. City of Chicago*, 817 F.3d 561, 565 n.1 (7th Cir. 2016); *Hooper*, 804 F.3d at 853 n.2.

U.S. 75, 78 (1998) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Hostile work environment cases originated in the context of Title VII of the Civil Rights Act (applicable to claims of discrimination on the basis of race, color, religion, sex, or national origin), 42 U.S.C. § 2000(e), but have been applied in this circuit to harassment based on disability as well. *See Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019). This court has also assumed, without deciding, that a hostile work environment claim can be brought under the ADEA. *See Tyburski*, 964 F.3d at 600; *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir. 2001); *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 827 (7th Cir. 1999).

Once again, we use a multistep framework to organize how we evaluate hostile work environment claims. A plaintiff must demonstrate that (1) she was subject to unwelcome harassment; (2) the harassment was based on disability or age or another protected category; (3) the harassment was sufficiently severe or pervasive, both subjectively and objectively, so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 714–15 (7th Cir. 2021); *Tyburski*, 964 F.3d at 601–02; *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). Insults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance. *Id.* Although we certainly do not condone such behavior, and recognize that a series of separate, isolated acts can collectively add up to a hostile work environment, occasional vulgar language, and coarse, rude, or boorish behavior will not

amount to a hostile work environment. *See Racicot*, 414 F.3d at 678.

The district court found no evidence whatsoever of a hostile environment based on the plaintiff's PTSD, and we agree. Brooks does not allege that anyone made any comments at all about her PTSD and concedes that she did not tell any of her co-workers about her PTSD, including the co-workers who made offensive comments to her. None of the comments she alleges occurred have anything to do with PTSD or any other disability. The other complaints Brooks had about her co-workers' abusive conduct—swearing, refusing to follow her directions, using disrespectful language—were not focused on her age or disability and thus could not create a hostile work environment on the basis of a protected category.

As for her age claim, as we noted, her team lead's comment that "they said you're too old" to train was quickly rectified. As for the three employees—Chambers, Crawford, and Goodwin—who regularly told Brooks she was old and slow, Brooks did not have specific examples of statements made by any of these employees. She testified only that "Um, because of my age, I would regularly be harassed by these three, … Ms. Chambers, team lead, Ms. Crawford, quality control, and Christeena [Goodwin], team member." R. 65-15 at 28 (Dep. p. 110). When asked about specific statements they made, Brooks responded, "Liza would verbally complain about me being too slow, um, Tiffany would, uh, quality control, would also complain about me being too slow, and she even said I was, you know, these old people and make reference to my age and so did, uh Chris …, uh, Ms. Goodwin." *Id.* (Dep. pp. 110–11). When pressed further for specific examples, Brooks responded, "Just comments that, uh, about, about my age. She

would comment about my age and being too slow." *Id.* at 28 (Dep. p. 111). When asked for a third time to identify specific comments, Brooks responded that Tiffany would, "come and stand over me when I'm working routinely and make little comments, and, and, and move stuff around and just be all in my area, uh, stating that she could write me up and just harass me." *Id*. She also testified that Goodwin "would harass me because, um, you know, she felt I was, you know, um, just slow. She felt I was slow, and she could do the job better. She would routinely tell me, oh, I, tell Liza and Tiffany, oh, I, … I'm doing better than she's doing. And she would routinely make little snide comments about my age." *Id.* at 28 (Dep. p. 112). Once again, counsel for Avancez asked for specific examples, but Brooks only had broad generalizations: "one day she, uh, um, um, one day she, uh, she, she wanted to, I guess she wanted Li … I don't know. She, she just would routinely do it and I recall one time she said something about my age and she actually left the line without permission. … They would just make the comment, these, these older people are slow." *Id*. Brooks reported that Crawford and Goodwin each made these comments more than twice but less than ten times. *Id.* at 28–29 (Dep. pp. 111–13). Neither the severity nor frequency of the comments is sufficient to constitute a hostile work environment. The insults Brooks received may be juvenile, insulting, and boorish, but no reasonable jury could find that they were so frequent or pervasive as to create a hostile work environment. *See Tyburski*, 964 F.3d at 602. We need not address the remaining factors of a hostile work environment claim.

## C. Intentional infliction of emotional distress.

On September 14, 2020, Brooks filed a motion for leave to amend the complaint to add a claim for intentional infliction

of emotional distress. The district court held that Brooks' claim for intentional infliction of emotional distress was futile and could not survive a dispositive motion. Generally, denials of leave to amend are reviewed for abuse of discretion. *Gandhi v. Sitara Cap. Mgmt., LLC*, 721 F.3d 865, 868 (7th Cir. 2013). But when the basis for denial is futility, we apply the legal sufficiency standard of Rule 12(b)(6) to determine whether the proposed amended complaint fails to state a claim. *See, e.g., General Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997). Accordingly, our review for abuse of discretion of futility-based denials includes de novo review of the legal basis for the futility. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015).

Indiana courts have been reluctant to apply the tort of intentional infliction of emotional distress to employment situations, and our circuit, in applying Indiana law has followed suit. *Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d 936, 941 (7th Cir. 2012); *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1997). To prevail on such a claim, Brooks would have to show that Avancez engaged in (1) extreme and outrageous conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress. *See York v. Fredrick*, 947 N.E.2d 969, 976 (Ind. Ct. App. 2011). The conduct alleged must be "so outrageous" and "so extreme" so as to go "beyond all possible bounds of decency." *Id.* at 976–77. Under the facts alleged by Brooks, she encountered rude, inappropriate, and unprofessional behavior from co-workers. No reasonable fact finder, however, could find that the behavior was so extreme and outrageous as to go beyond all possible bounds of decency. The district court properly dismissed Brooks' request for leave to add such a claim.

The opinion of the district court is AFFIRMED in all respects.