In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1714
TOYA R. CRAIN,
 Plaintiff-Appellant,
 v.

DENIS R. MCDONOUGH,
Secretary of Veterans Affairs,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Indiana, Indianapolis Division.
 No. 19-cv-03967 — Richard L. Young, Judge.
 ____________________

 ARGUED JANUARY 5, 2023 — DECIDED MARCH 17, 2023
 ____________________

 Before FLAUM, ROVNER, and BRENNAN, Circuit Judges.
 FLAUM, Circuit Judge. Toya Crain, a Black female, was re-
assigned to a new position at the Richard L. Roudebush Vet-
erans’ Administration Medical Center (the “VA Center”) in
Indianapolis, Indiana. Thereafter, she filed employment dis-
crimination and retaliation claims pursuant to Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The district
2 No. 22-1714

court granted her employer’s motion for summary judgment,
and Crain now appeals. For the following reasons, we affirm.

 I. Background

 A. Factual Background
 Crain was the Acting Chief of the Environmental Manage-
ment Service (“EMS”) at the VA Center from April 1, 2014,
through July 12, 2014.1 EMS provides janitorial and sanitation
services for the VA Center. An HR memorandum with the
subject “Stretch Assignment” indicates that Crain took the po-
sition as a “learning opportunity” to “shadow the duties per-
formed” in the Chief of EMS position, but that the role “was
not supervisory in nature.” Crain then assumed the Chief of
EMS role on July 13, 2014, subject to a yearlong supervisory
probationary period, which, according to the VA Center, be-
gan on July 13.
 At the time Crain applied for the Chief of EMS position, it
was classified as a GS-12 pay grade. Before Crain applied,
however, she was told that if she successfully completed her
probationary period, the VA Center would try to get the po-
sition’s pay grade increased to the GS-13 level. Shortly after
Crain assumed the Chief of EMS position, her supervisor
(Cathy Lee-Sellers) added responsibilities to the role in an ef-
fort to justify a higher pay grade. She then asked Elaine Scaife,
an HR classification specialist, to upgrade the role to the GS-
13 pay grade. Scaife conducted an “extensive review” of the

 1 The VA Center is organized into multiple divisions, known as “ser-

vices.”
No. 22-1714 3

position and ultimately concluded that she was unable to
“justify anything higher than a GS-12.”
 Crain alleges that the pay grades of White service chiefs
with similar duties and responsibilities were elevated even
though hers was not. Specifically, according to Crain, six
White service chiefs’ pay grades were elevated to the GS-13
or GS-14 level while her pay grade increase was denied. Scaife
explained that at one point, the VA Center’s Medical Director
elevated the pay grade for the Chief of Logistics, who was
White, even though Scaife did not agree with the classifica-
tion. Scaife also testified that the Medical Director restruc-
tured positions and services to create a new GS-14 chief posi-
tion for a White employee.
 1. Performance Issues
 During Crain’s tenure as Chief of EMS, several perfor-
mance and behavior-related concerns arose.
 a. Nurse Uniforms
 In October 2014, EMS was responsible for distributing
new uniforms to the VA Center nursing staff. VA Center lead-
ership testified that they received many complaints regarding
EMS’s handling of the project, centering on Crain’s failure to
adequately staff the project, utilize the appropriate equip-
ment, and effectively distribute the inventory.
 b. Profanity Use
 During Crain’s tenure as Chief of EMS, VA Center leader-
ship received multiple reports of her using profanity in the
workplace. On December 8, 2014, Crain and other EMS super-
visors received a memo from Lee-Sellers instructing them “to
cease and desist immediately from usage of this type of
4 No. 22-1714

language.” Denouncing such “profan[e] and/or abusive lan-
guage” as “unacceptable and inappropriate,” Lee-Sellers
warned that if the behavior continued, disciplinary action
would be taken. Despite this admonition, on February 13,
2015, Lee-Sellers received a report that Crain used profanity
during a meeting, and in early June 2015, VA Center leader-
ship received additional reports that Crain used profanities
and “abusive language” toward EMS employees.
 c. Cleaning Solution Change
 In the Spring of 2015, Crain decided to switch the cleaning
solution used at the VA Center. Shortly after, Lee-Sellers re-
ceived complaints about the planned change, claiming that it
would put the patients and staff at risk. Specifically, members
of the Infection Control and Prevention Committee testified
that Crain rushed the change without the appropriate level of
communication, input, or training.
 d. Assistant Chief of EMS Interview Process
 In May 2015, the VA Center began interviewing candi-
dates to fill the position of Assistant Chief of EMS, Crain’s sec-
ond-in-command. Crain was on the interview panel and
helped draft the interview questions. One of the candidates
was Robert Franklin, who had been working as the Acting As-
sistant Chief under Crain for several months. After the inter-
views, members of the panel expressed concern that Franklin
might have had advance notice of the questions. Franklin ul-
timately admitted that Crain told him which forms to review
and specific topics to research before the interview.
 2. Removal from Chief of EMS Position
 On June 23, 2015, Crain received a memorandum inform-
ing her that she had “failed to satisfactorily complete [her
No. 22-1714 5

yearlong] supervisory probationary period” for the Chief of
EMS position and, as a result, she was being reassigned to a
different role with the same salary. The memo identified mul-
tiple “performance-based deficiencies” as the basis for the de-
cision, including the poorly managed uniform project, her
failure to heed the December 2014 warning regarding her use
of profanity, the hasty cleaning solution change, and her in-
terference in the Assistant Chief interview process.
 B. Procedural Background
 In March 2015, months before her reassignment, Crain in-
itiated an Equal Employment Opportunity Commission
(“EEOC”) complaint alleging that one of her subordinates
“verbally attacked” her and that the VA Center had not re-
sponded sufficiently because of her race and sex. In April
2015, she added a charge alleging that she was “not making
the same salary as White males who held the same position.”
After her removal from the Chief of EMS position, Crain
added yet another charge alleging that her reassignment was
retaliatory.
 Crain ultimately filed suit against Denis McDonough, in
his official capacity as the Secretary of Veterans Affairs, alleg-
ing various Title VII violations. The VA moved for summary
judgment on all Crain’s claims, and the district court granted
that motion. Crain now appeals the following two claims:
(1) disparate pay based on her race and (2) that she was re-
moved as the Chief of EMS in retaliation for filing an EEOC
complaint.2

 2 Crain’s opening brief does not advance any arguments regarding the

remainder of her claims, and her reply brief does not respond to the VA’s
contention that this amounts to waiver. As a result, Crain has waived any
6 No. 22-1714

 II. Discussion

 We review the district court’s grant of summary judgment
de novo. Zall v. Standard Ins. Co., 58 F.4th 284, 291 (7th Cir.
2023). Summary judgment is appropriate if “there is no genu-
ine dispute as to any material fact” and the moving party “is
entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a).
In applying this standard, we read the facts and draw reason-
able inferences in the light most favorable to Crain, the non-
moving party. Moran v. Calumet City, 54 F.4th 483, 491 (7th Cir.
2022).

 A. Disparate Pay
 Crain contends that her position was discriminatorily kept
at a GS-12 pay grade because she is Black, while several White
service chiefs’ positions were elevated to GS-13 or GS-14 pay
grades.3 Title VII requires that “[a]ll personnel actions affect-
ing [federal] employees … be made free from any discrimina-
tion based on race.” 42 U.S.C. § 2000e-16(a). So, to hold the VA
Center liable, Crain must show that her race “played a part”
in the alleged disparity in compensation. Huff v. Buttigieg, 42

challenge to the district court’s judgment of her following claims: sexually
hostile work environment, disparate pay based on her sex, and any retal-
iatory act other than her removal from the Chief of EMS position. See Mil-
ler v. Chi. Transit Auth., 20 F.4th 1148, 1155 (7th Cir. 2021); Terry v. Gary
Cmty. Sch. Corp., 910 F.3d 1000, 1008 n.2 (7th Cir. 2018).
 3 Crain does not allege that Scaife discriminated against her by declin-

ing to reclassify her position. Instead, she argues that VA Center leader-
ship discriminatorily refused to raise her pay grade despite Scaife’s clas-
sification.
No. 22-1714 7

F.4th 638, 647 (7th Cir. 2022).4 She can do so through “direct
or circumstantial evidence of discrimination,” as “all evi-
dence belongs in a single pile and must be evaluated as a
whole.” Igasaki v. Ill. Dep’t of Fin. & Pro. Regul., 988 F.3d 948,
957 (7th Cir. 2021) (quoting Ortiz v. Werner Enters., Inc., 834
F.3d 760, 766 (7th Cir. 2016)).
 Crain proceeds under the McDonnell Douglas burden-
shifting framework, McDonnell Douglas Corp. v. Green, 411
U.S. 792, 802−03 (1973), “which gives the plaintiff the initial
burden to establish a prima facie case of discrimination, after
which the burden shifts to the defendant to provide a legiti-
mate justification, before finally shifting back to the plaintiff
to establish that such justification was pretextual,” Dunlevy v.
Langfelder, 52 F.4th 349, 353 (7th Cir. 2022). See Miller v. Saul,
803 F. App’x 963, 968 (7th Cir. 2020) (applying the McDonnell
Douglas framework to federal-sector employment discrimina-
tion claim).
 To shoulder her burden of establishing a prima facie case
of discrimination, Crain must identify “another similarly situ-
ated employee outside of [the plaintiff’s] protected class [who]
received better treatment from his employer.” Igasaki, 988
F.3d at 957 (emphasis added). Indeed, “[a]t the very heart of
an unequal pay claim is the plaintiff’s burden to show

 4 Both parties incorrectly apply the but-for causation standard utilized

in private-sector employment cases. See Huff, 42 F.4th at 645 (“By express
design, the private-sector provisions [of Title VII] do not apply to federal
employe[r]s ….”). As this Court recently held, federal employers—like the
VA Center—are held to a different standard. See id. (holding that § 2000e-
16 “d[oes] not require but-for causation” and instead prohibits any dis-
crimination based on a protected characteristic that “play[s] a part in an
employment decision” (emphasis added)).
8 No. 22-1714

unequal pay for equal work.” Palmer v. Ind. Univ., 31 F.4th 583,
590 (7th Cir. 2022); see Poullard v. McDonald, 829 F.3d 844, 854
(7th Cir. 2016) (“In the disparate-pay context, this inquiry
boils down to a showing of equal work for unequal pay, with
the protected class as the distinguishing factor.”).
 “Although they need not be identically positioned,” Iga-
saki, 988 F.3d at 958, “a plaintiff must show the purported
comparator was directly comparable to her in all material re-
spects so as to eliminate other possible explanatory varia-
bles,” Downing v. Abbott Lab’ys, 48 F.4th 793, 805 (7th Cir. 2022)
(citations and internal quotation marks omitted), cert. denied,
No. 22-649, 2023 WL 2357388 (Mar. 6, 2023) (mem.). “Relevant
factors include whether the employees (i) held the same job
description, (ii) were subject to the same standards, (iii) were
subordinate to the same supervisor, and (iv) had comparable
experience, education, and other qualifications ….” David v.
Bd. of Trs. of Cmty. Coll. Dist. No. 508, 846 F.3d 216, 226 (7th
Cir. 2017) (citation and internal quotation marks omitted).
 Crain asserts that other non-medical service chiefs—like
the Chiefs of Logistics, Police, and Food and Nutrition Ser-
vices—are valid comparators because they each lead a service
at the VA Center, are on the same managerial level, and report
to VA Center executive management. She maintains it is irrel-
evant that these chiefs perform distinct functions and types of
work. However, this is plainly incorrect. See id. at 226−27 (not-
ing that a comparator’s job description and responsibilities
are relevant to the disparate pay inquiry and concluding that
employee with different position was not a valid comparator
where “even a cursory comparison” of their duties revealed
differences). Indeed, the record reflects that each service chief
performs different work and is subject to a different set of
No. 22-1714 9

standards and that, as such, their pay grades are not directly
comparable.
 This is not to say, as Crain contends, that simply because
she is the only Chief of EMS at the VA Center, no valid com-
parators exist. See Johnson v. Zema Sys. Corp., 170 F.3d 734, 743
(7th Cir. 1999) (“An employer cannot insulate itself from
claims of racial discrimination simply by providing different
job titles to each of its employees.”). Rather, Crain has failed
to carry her burden of demonstrating that she shares “enough
common factors” with the other service chiefs “to allow for a
meaningful comparison.” Palmer, 31 F.4th at 590 (citation
omitted). On this record, the differences between Crain and
the other service chiefs “overwhelm the similarities.” Down-
ing, 48 F.4th at 806.
 “Without any comparator in the record against whom
[she] was underpaid, the totality of the evidence simply does
not support a reasonable inference of race discrimination
against [Crain] when it came to [her] pay.” Palmer, 31 F.4th at
592.5

 5 Crain also articulates various ways in which she allegedly met the

VA Center’s expectations and reasons why she claims the VA Center’s jus-
tifications for not raising her pay grade are pretextual. See Dunlevy, 52
F.4th at 353 (identifying that employee “met h[er] employer’s legitimate
job expectations” as element of prima facie case of discrimination (citation
and internal quotation marks omitted)). However, because Crain fails to
put forth a sufficient comparator, we need not address these arguments.
See Brooks v. Avancez, 39 F.4th 424, 435 (7th Cir. 2022) (“[I]t is not always
necessary to march through this entire process if a single issue proves to
be dispositive.” (citation omitted)); Palmer, 31 F.4th at 592 (“[A]n unequal
pay claim begs for some comparator evidence: unequal to what?”).
10 No. 22-1714

 B. Retaliation
 Next, Crain argues that VA Center leadership removed
her from the Chief of EMS position in retaliation for her filing
an EEOC complaint. To prove her claim, Crain must muster
enough direct and/or circumstantial evidence “to show that
her employer’s action was retaliatory.” Huff, 42 F.4th at 646.
Such circumstantial evidence may include “suspicious tim-
ing … or evidence the employer’s proffered reason for the ad-
verse action was pretextual.” Rozumalski v. W.F. Baird & As-
socs., Ltd., 937 F.3d 919, 924 (7th Cir. 2019) (citation omitted).
For Crain’s claim to succeed, the record “must permit the fact-
finder to conclude the employer’s retaliatory animus played
a part in [the] adverse employment action.” Huff, 42 F.4th at
647.
 Crain primarily argues that the VA Center’s stated reasons
for removing her as Chief of EMS are pretextual—that is, “an
attempt to mask a discriminatory reason with a legitimate ex-
cuse.” Brooks, 39 F.4th at 434. Pretext is not “just faulty reason-
ing or mistaken judgment on the part of the employer; it is [a]
lie, specifically a phony reason for some action.” Burton v. Bd.
of Regents of Univ. of Wis. Sys., 851 F.3d 690, 698 (7th Cir. 2017)
(alteration in original) (citation omitted). Thus, “[a]n inquiry
into pretext requires that we evaluate the honesty of the em-
ployer’s explanation, rather than its validity or reasonable-
ness.” Rozumalski, 937 F.3d at 927 (alteration in original) (cita-
tion omitted). To demonstrate pretext, Crain “must identify
such weaknesses, implausibilities, inconsistencies, or contra-
dictions in [the VA Center’s] stated reason[s] that would per-
mit a reasonable person to conclude that the stated reason[s]
[are] unworthy of credence.” Robertson v. Dep’t of Health Servs.,
No. 22-1714 11

949 F.3d 371, 380 (7th Cir. 2020) (citation and internal quota-
tion marks omitted).
 Although the briefing leaves Crain’s argument opaque,
she seems to suggest that a jury would be more likely to con-
clude that the VA Center’s stated reasons for reassigning her
are pretextual because the VA Center “dishonest[ly]” miscal-
culated her probationary period. The June 2015 memo inform-
ing Crain of her reassignment asserts that she was still within
her yearlong supervisory probationary period, which began
when she assumed the Chief position. Crain counters that the
period began when she assumed the Acting Chief position,
meaning that the period was already over when she was re-
assigned for “fail[ing] to satisfactorily complete” it. Crain’s
primary support comes from her reading of 5 C.F.R. § 315—a
regulation pertaining to civil service personnel in the federal
sector.
 Yet, we need not wade into the parties’ competing regula-
tory interpretations because Crain fails to present any evi-
dence to suggest her EEOC activity played a part in the VA
Center’s alleged miscalculation.6 Rather, the Stretch Assign-
ment memo documenting Crain’s acceptance of the Acting
Chief position—dated months before she filed her EEOC
complaint—explicitly provides that the role “was not super-
visory in nature.” It therefore documents the VA Center’s

 6 Regardless, an employer’s misinterpretation of a policy or regulation

is generally only evidence of pretext where it is so far afield to be unwor-
thy of credence. See Huff, 42 F.4th at 648−49 (determining reasonable juror
could find pretext where the employee was “fired for sending emails in-
stead of making phone calls on merely five occasions over a one-year pe-
riod” even though the policy “did not expressly prohibit email communi-
cation”). Here, that is not the case.
12 No. 22-1714

belief—before Crain engaged in any EEOC activity—that
Crain’s time in that role would not accrue toward her year-
long supervisory probationary period. See Rozumalski, 937
F.3d at 926 (concluding plaintiff “ha[d] an insurmountable
problem with timing” where employer’s documented belief
“predate[d] any of her complaints”). At bottom, Crain comes
up short because she does not “tak[e] the added, necessary
step of pointing to evidence that the purported lie masked a
proscribed reason” for her reassignment. Xiong v. Bd. of Re-
gents of Univ. of Wis. Sys., No. 22-1271, 2023 WL 2421710, at *3
(7th Cir. Mar. 9, 2023).
 Crain also takes aim at the following “performance-based
deficiencies” the VA Center cited in support of removing her
as Chief of EMS: (1) the poorly managed uniform project,
(2) Crain’s failure to heed the December 2014 warning regard-
ing her use of profanity, (3) the hasty cleaning solution
change, and (4) her interference in the Assistant Chief inter-
view process. We address each in turn.
 1. Nurse Uniforms
 Crain points out that multiple employees testified to her
hard work on the uniform project, deeming it “unfair” to
blame her entirely for the rocky rollout. However, when ana-
lyzing whether a proffered reason is pretextual, “we do not
evaluate whether [it] was accurate or even whether it was un-
fair. Our sole focus is on whether the employer’s stated reason
can be characterized as a falsehood rather than an honestly
held belief.” Brooks, 39 F.4th at 435 (citation omitted). Crain
puts forth no evidence to suggest that the VA Center did not
No. 22-1714 13

honestly believe Crain’s handling of the uniform project was
inadequate.
 2. Profanity Use
 Crain denies using profane or abusive language in the
manner alleged in the December 2014 memo and disputes the
underlying complaints regarding her language. But disagree-
ment with “the basis for the warning … or the substance of
the employees’ complaints is irrelevant to our inquiry. The
only question that matters is whether [the VA Center] actually
believed it had a legitimate basis” to reassign Crain. Lauth v.
Covance, Inc., 863 F.3d 708, 717 (7th Cir. 2017).
 Crain also points to her coworkers’ testimony that other
VA Center employees, including management, used profan-
ity at work and were apparently not disciplined. However,
Crain has not put forth any evidence to suggest that these em-
ployees were subject to the same warning as her—specifically
cautioning her that continued use of profane language would
lead to disciplinary action—or that their use of profanity even
led to complaints in the first place. See Rozumalski, 937 F.3d at
927 (rejecting unequal discipline argument where “the record
[wa]s lacking critical details” about the alleged comparators’
performance history).
 Most importantly, the fact that the VA Center informed
Crain of its concerns regarding her use of profanity months
before she filed any EEOC charges “rules out any suggestion
that [the VA Center] fabricated its criticism of [Crain’s] [lan-
guage] after the fact.” Bragg v. Munster Med. Rsch. Found. Inc.,
58 F.4th 265, 272 (7th Cir. 2023); see Rozumalski, 937 F.3d at
926−27 (concluding that plaintiff’s retaliation claim failed
where, by the time her supervisors learned of her protected
14 No. 22-1714

activity, “there were already four months of documented per-
formance issues on her record”). In short, a reasonable juror
could not conclude that the VA Center’s decision to follow
through on a warning—issued before Crain initiated any
EEOC activity—was a lie to cover up her supervisors’ retalia-
tory animus.
 3. Cleaning Solution Change
 Crain maintains that she received the necessary approvals
before switching the cleaning solution and that the change
was beneficial to the VA Center. But, again, this argument “is
a distraction … because the question is not whether the em-
ployer’s reasons for a decision are right but whether the em-
ployer’s description of its reasons is honest.” Brooks, 39 F.4th
at 436 (alteration in original) (citation and internal quotation
marks omitted). Crain points to no evidence that the VA Cen-
ter did not honestly believe she failed to follow the proper
procedure when making the change. Instead, the record re-
flects that Crain’s supervisors were genuinely concerned with
the hasty rollout of the new cleaning solution.
 4. Assistant Chief of EMS Interview Process
 Bolstering the VA Center’s decision to reassign Crain was
the fact that it received complaints that Crain may have
helped prepare Franklin, the Acting Assistant Chief of EMS,
for the interview process. Crain disputes this, claiming Frank-
lin denied that she gave him “any inside hints at what the in-
terview questions” would be. However, Crain’s challenge
misses the mark for the same reason as her others: Irrespective
of whether Crain actually interfered in the interview process,
what matters is whether her supervisors genuinely believed
she did. See Abebe v. Health & Hosp. Corp. of Marion Cnty., 35
No. 22-1714 15

F.4th 601, 607 (7th Cir. 2022) (“[T]he fact that [the employee]
disagrees with her supervisor’s assessment [of a situation]
does not establish pretext.”). Crain provides no evidence to
suggest otherwise.
 In sum, Crain has failed to identify any “weaknesses, im-
plausibilities, inconsistencies, or contradictions in [the VA
Center’s] stated reason[s] that would permit a reasonable per-
son to conclude that the stated reason[s] [are] unworthy of
credence.” Robertson, 949 F.3d at 380 (citation and internal
quotation marks omitted). Crain’s argument boils down to:
“because, in [her] view, [her] supervisors’ concerns were mis-
taken or misplaced, the actions they took must have been re-
taliatory.” Lauth, 863 F.3d at 717. This is insufficient to create
a genuine dispute of material fact considering the “abundant
evidence of [Crain’s] substandard performance” put forth by
the VA Center. Bragg, 58 F.4th at 271.

 III. Conclusion

 For the foregoing reasons, we AFFIRM the judgment of the
district court.